RAYMOND BAUSCHARD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 62805.    Filed January 30, 1959.

*Roger K. Powell, Esq.,* and *D. Curtis Reed, Esq.,* for the petitioner.
*David M. Robinson, Esq.,* for the respondent.

TIETJENS, *Judge:* This proceeding involves the following deficiencies in income tax and additions thereto:

| Year | Deficiency | Additions to tax | |
| | | Sec. 294(d)(1) (A) or (B) [1] | Sec. 294(d)(2) |
| 1952 | $2,139.31 | ---------- | $124.93 |
| 1953 | 19,269.39 | $836.02 | ---------- |
| 1954 | 9,606.63 | ---------- | 612.12 |

[1] An addition to tax for 1953 was determined in the alternative *either* under section 294(d)(1)(A) for failure to file a declaration of estimated tax, *or* under section 294(d)(1)(B) for failure to pay installments of estimated tax.

The issues are: (1) Whether the gains realized on the sale of certain real estate were taxable as long-term capital gains or as ordinary income; if taxable as ordinary income (2) whether petitioner was liable for self-employment taxes during the years in issue; and (3) whether the additions to tax under either section 294(d)(1)(A) or 294(d)(1)(B) for 1953, and under section 294(d)(2) for 1952 and 1954 were properly determined.

FINDINGS OF FACT.

The stipulated facts are so found, and are incorporated herein by this reference.

During the years in issue, Raymond Bauschard (hereinafter referred to as the petitioner) resided in Columbus, Ohio, and filed individual Federal income tax returns with the director of internal revenue for the district of Columbus, Ohio.

Petitioner is a secular priest of the Roman Catholic Church, belonging to the diocese of Columbus. Since 1929, he has been pastor of St. Mary Magdalene's Church, having a parish extending through an area of Columbus known as Hilltop. As a secular priest, petitioner was not required to and did not take a vow of poverty.

In 1951, the Hilltop area constituted the southwest limits of the city of Columbus, and was composed of families from the middle and upper classes. Their homes were commensurate with their standard of living, and gave the community a standing of relative prominence. Located within the boundaries of Hilltop was a 77-acre tract of unim-

proved farmland, known as the Snider farm. This tract was situated some three-quarters of a mile from the site of petitioner's parish buildings.

Early in 1951, the residents of Hilltop learned of a plan to utilize the Snider farm as the building site for a low-cost housing project. As then planned, the project was to consist of multiple-unit homes constructed of cinder block with an approximate value of $3,500. The Hilltop homeowners were opposed to the project, and formed the Camp Chase Civic Association, an organization of some 2,000 members, to prevent its erection. Beginning in April 1951, the association contacted various individuals within the community to secure their aid and advice with respect to barring the proposed project.

Shortly after its organization, Harold Banker, president of the association, met with the petitioner to secure his views with respect to the housing project. Petitioner then was contemplating the erection of a new church and rectory at an estimated building cost of $400,000. His opinion was that the proposed project would have an undesirable influence upon the area, and suggested that the association attempt to interest some builders in the property with an eye to constructing homes thereon more in keeping with those already in existence in the Hilltop community. However, as of that time he had no intention of acquiring the property himself. The association then proceeded to contact some 12 such individuals within the Hilltop area to determine what interest they might have in developing the property. They also approached individuals in a position, financially, or otherwise, to aid in the acquisition of the property.

One of the builders with whom Banker met was Edward A. Tonti, a close friend of petitioner's and a member of his parish since 1945. While his family had always been engaged in real estate development, Tonti himself had not become actively employed therein until the end of World War II. On various occasions, Tonti had helped petitioner in the construction of certain structures about his parish grounds. On one occasion, petitioner had loaned Tonti $8,000 on an unsecured note, which Tonti used to acquire lots for the construction of homes.

During 1951, building lots in the Hilltop area were in short supply. Tonti was aware of a ready market among other builders for the Snider tract if it could be acquired and properly developed, but he lacked the necessary funds for carrying out such a project. Shortly after the organization of the Camp Chase Civic Association, Tonti and petitioner began to discuss the purchase of the Snider property. These discussions continued on and off throughout the summer of 1951. During that period, Tonti entered into conferences with the Snider family relative to the purchase of their property. Petitioner took no part in the negotiations.

As a result of the discussions with Banker and Tonti, petitioner decided to purchase the Snider tract. While his primary objective was to prevent the erection of the low-cost housing project, he also expected a profitable return on his money. However, since he lacked sufficient funds to finance the acquisition alone, he approached Harry Haney, a local druggist, and asked him if he wanted to invest in the property. Haney expressed interest, and, in October 1951, petitioner and Haney acquired an option to purchase the land. It was understood that petitioner was to have a two-thirds interest, and Haney a one-third interest in the property. Thereafter, Haney played a passive role with respect to the land, leaving all decisions to the petitioner.

After the option had been acquired, all transactions dealing with the property were supervised by Tonti's attorney, Estel O. Gifford. Petitioner was apprised of the tax consequences which might result from any disposition of the property. In order to isolate petitioner and Haney from any activities concerning the property, it was decided that the land would be held in trust for them. A declaration of trust was executed by John D. Waldo and Joe Fodey whereby they declared they were holding the property in trust for the petitioner and Haney. The option to purchase was exercised, and on October 29, 1951, the Snider tract was transferred to Waldo and Fodey as trustees. The approximate purchase price of the property was $77,000, petitioner furnishing two-thirds thereof.

During October and November of 1951, Tonti had the property platted, and the plat was then submitted for approval to a rural planning commission. As platted, the property was divided into two sections, designated Rosary Subdivision No. 1 and Rosary Subdivision No. 2.

On January 27, 1952, the trustees executed a document which, after reciting the facts relative to the purchase of the land by petitioner and Haney and its subsequent platting by Tonti, declared that a division of the lots had been made between petitioner and Haney in proportion to the purchase price furnished by each, and that as trustees they were holding the property respective to that division to be conveyed as either petitioner or Haney should direct.

On April 1, 1952, the trustees entered into a lease agreement with Tonti whereby they leased the property to him for a 5-year term at an annual rental of $100, it being understood that it was his intention to plat, subdivide, and improve the property. He was given the exclusive option to purchase any or all of the lots into which the property might be divided at a price per lot to be determined between the parties. It was provided that he was to bear all the expenses incurred in platting, subdividing, and improving the property and further

that he was authorized to enter into contracts, as vendor, for the sale of any lot contained therein. Upon his failure to perform any of the requirements of the lease, a termination of its terms was provided.

Thereafter, Tonti had plans made for sewers, waterlines, and streets in order to arrive at an estimate of the cost of these improvements. Upon the basis of that estimate, Tonti considered he would be well compensated for his development activities if he made $150 on each lot in the proposed subdivision. Petitioner and Tonti then entered into discussion relative to the purchase price which Tonti was to pay for each lot. Petitioner, being aware of the general value of building lots in the community, had already arrived at a predetermined figure. Disagreement developed between them with respect to that amount, petitioner holding out for his price and Tonti arguing for the lower price of $500 per lot. Tonti was unwilling to meet petitioner's figure in the light of his estimated development expenses. The controversy was resolved, and it was agreed that Tonti would pay $600 per lot for the land in subdivision No. 1, and $700 per lot for the land in subdivision No. 2. The price thus agreed upon was for the lots without improvements.

On April 28, 1952, the Rosary Development Company, an Ohio corporation, was organized with 5 shares of capital stock having a stated value of $100 per share issued: 3 shares to Tonti, its president; 1 share to Gifford, its secretary; and 1 share to Richard J. Albanese, its treasurer. On April 30, 1952, Tonti assigned his interest in the lease to the corporation. Thereafter, improvements were placed upon the land. Those improvements were financed partly from down-payments on the lots by builders, partly from bank loans, and partly from Tonti's own funds. The improvements in subdivision No. 1 were completed in the early fall of 1952 at a cost of over $100,000. The improvements in subdivision No. 2, started in the spring of 1952 and completed later in that year, cost over $125,000. As managing agent for the corporation, Tonti supervised improvement of the land.

In August 1952, the trustees conveyed all the lots in both subdivisions to Gifford for the purpose of establishing building restrictions thereon. The lots were then reconveyed to Waldo as sole trustee.

Upon completion of the improvements, the corporation commenced active efforts to dispose of the property. The lots were sold to individuals and corporations engaged in the business of building houses. As each lot was sold a deed was prepared for the trustee's signature, and title was thereby transferred directly to the purchaser. Upon delivery of a lot, an accounting was made by the corporation to the trustee informing him of the sale. He in turn notified petitioner and Haney. As soon as the purchase price was received by the corporation, $600 or $700, depending upon the subdivision involved, it was remitted to Waldo who deposited the money in an account as trustee

for petitioner and Haney. Whenever there was an accumulation in that account of funds in any sizable amount, it was withdrawn and distributed proportionately between petitioner and Haney.

By October 3, 1955, all of the lots had been disposed of through 65 separate sales involving 23 purchasers. The total sales price received by the corporation was $574,208. All of the sales, with the exception of a single sale of 14 lots on October 3, 1955, occurred during 1952, 1953, and 1954.

As compensation for his development and selling efforts Tonti received $150 per lot sold from the corporation. He received nothing in 1952, $28,950 in 1953, and $14,600 in 1954.

Treating the gains realized by the trust upon the disposition of the lots as long-term capital gains, Waldo reported one-half thereof in the fiduciary returns prepared by him for each of the years in issue. On his returns for each of those years, petitioner, as benefici- ary, reported his proportionate share of the amount so returned by the trust. Respondent determined that the gains so realized con- stituted ordinary income, and correspondingly increased the trust's income and petitioner's distributive share thereof for each of the years in issue.

The lots from which petitioner realized gains during 1952, 1953, and 1954 were held by him primarily for sale to customers in the ordinary course of business.

OPINION.

Excluded from the definition of a capital asset is property held by a taxpayer primarily for sale to customers in the ordinary course of his trade or business.[1] The issue confronting us here is whether petitioner's activities with respect to the purchase, development, and sale of the Snider tract were of such a nature as to constitute a trade or business. As we have often said, this is a question of fact.

Petitioner's argument is a simple one. He submits that he acquired the property primarily to protect his parish from deterioration due to the encroachment of substandard dwellings; that he sold it in order to realize that objective by securing high-grade homes in the area, and that neither he nor his trustee was in the business of selling lots to customers. He contends a single contract of sale was entered into which was consummated at various times by the transfer of property to Tonti's nominees, none of whom was his or his trustee's customer. He relies in great part upon *Yunker* v. *Commissioner*, 256 F. 2d 130 (C.A. 6, 1958), reversing 26 T.C. 161 (1956).

---

[1] For the years 1952 and 1953 section 117(a) of the 1939 Code is applicable. For the year 1954 section 1221 of the 1954 Code applies. Because the holding period of the prop- erty involved was less than 5 years the provisions of section 1237 of the 1954 Code, deal- ing with real estate subdivided for sale, are not applicable.

Among the many tests which the courts have indicated are helpful in deciding whether property is held by a taxpayer as a capital asset or for sale to customers in the ordinary course of business are: The purpose for which the property was originally acquired; the activities of the seller, or those acting either with him or on his behalf, with respect to the improvement and actual disposition of the land; the frequency and continuity of sales; and the purpose for which the property was held during the taxable years.

Equally material to a proper consideration of the question is a recognition of the fundamental objective of the capital gain provisions of the Code; this is to grant preferential treatment to the gains realized upon those transactions which are not normally the source of business income, thus easing the tax burden which might otherwise result upon the sale of a capital investment. Inasmuch as these provisions constitute an exception to the normal tax requirements of the Code, they are to be narrowly construed. *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 964 (1958); *Corn Products Co.* v. *Commissioner*, 350 U.S. 46 (1955), rehearing denied 350 U.S. 943 (1956).

After a careful review of the record, we have concluded that petitioner and Tonti joined together in the creation of a joint venture to undertake the purchase, development, and sale of the Snider property. Petitioner was interested in the land both as a means for barring the low-cost housing project, as well as a means for realizing a profit on his investments. Tonti, on the other hand, was interested in the land for development purposes, but lacked the resources to acquire it. The parties then joined together in a common undertaking to purchase, develop, and sell the property. Tonti's discussions with the Snider family were obviously for petitioner's benefit as well as his own. The property was acquired, and thereafter all transactions were conducted under the supervision of Tonti's attorney. The parties were fully aware of the tax consequences of any disposition of the property, and in fact testified that they attempted in every manner to isolate the petitioner from any activity with respect thereto. The lease agreement was utilized as the most convenient manner of accomplishing their desired ends. As we view it, the agreement amounted to no more than a formalization of the joint venture. As a result, Tonti acquired possession of the property for a 5-year term for the purpose of its subdivision, development, and sale, and petitioner was assured of a stipulated price for each lot sold. Tonti contributed his skill and time, and agreed to bear the development costs. Petitioner contributed most of the purchase price. That Tonti acted through the medium of his controlled corporation does not change the result. *Kaltreider* v. *Commissioner*, 255 F. 2d 833 (C.A. 3, 1958), affirming 28 T.C. 121 (1957). Both were members of a joint venture, and the acts of each were directly

attributable to the other. *J. Roland Brady*, 25 T.C. 682 (1955); *Morris W. Zack*, 25 T.C. 676 (1955), affd. 245 F. 2d 235 (C.A. 6, 1957). Since there is no contention that the activities carried on by Tonti and the corporation did not constitute a trade or business, we have concluded that the petitioner was similarly engaged during the years in issue. Cf. *Welch* v. *Solomon*, 99 F. 2d 41 (C.A. 9, 1938). Accordingly, we have found as a fact that petitioner held the property in issue primarily for sale to customers in the ordinary course of business. We therefore hold that the gain realized on its sale was taxable as ordinary income.

Petitioner notes that though "it is legally possible for a Catholic priest to engage in the ordinary course of real estate development and sale as a sideline, it is certainly a most unusual concept." While on its face that statement may have some merit, the income here was petitioner's, and its character for tax purposes, for taxed it must be, was determined by the activities which produced it, and not by petitioner's vocation or position in the community. Since we think the activities herein involved definitely constituted a trade or business, and are attributable to petitioner as a member of the joint undertaking, the income arising therefrom must be taxed at ordinary rates.

A significant factor in this proceeding is the relatively short lapse of time between the various acts of acquisition, development, and ultimate sale of the Snider tract. The option to purchase was exercised in October 1951, and by April of 1952 the land had been platted and leased to Tonti for immediate development. By the fall of 1952, the first lots were being sold. Hence, this plainly is not the case of a casual liquidation of a capital investment acquired either by purchase or inheritance and held for a prolonged period of time. Rather, all the acts relative to the purchase of the land, its development, and ultimate sale were accomplished with remarkable speed. In our opinion, cases such as *Yunker* v. *Commissioner*, *supra*, involving the liquidation of inherited property held over many years, are distinguishable.

With respect to petitioner's contention that the property was acquired solely to protect the community, a final observation is pertinent. It has often been held that though the underlying purpose of the acquisition is to be given consideration, that purpose is necessarily subject to change. Where such has been the case, the original purpose gives way to the purpose for which the particular property is held at the time of its sale. *Mauldin* v. *Commissioner*, 195 F. 2d 714 (C.A. 10, 1952), affirming 16 T.C. 698 (1951). We believe that principle has proper application here. Petitioner's original interest in the property undoubtedly arose because of his wish to protect the community. However, once matters had progressed to the point of

acquisition of the property, that interest had been served, and another took its place; namely, the means of profitably disposing of the acquired land, albeit at the same time serving the original purpose. Further, the record indicates that the profit motive was always present, and thus was part of a dual purpose underlying the original acquisition.

On brief petitioner concedes that issues two and three, imposition of self-employment tax and additions to income tax, stand or fall with our decision on the issue just discussed. Accordingly, they are sustained subject to recomputation necessitated by concession of another issue.

*Decision will be entered under Rule 50.*