Edward Butler and Emma Butler v. Commissioner. Chester Cooper and Ruby Cooper v. Commissioner.
Butler v. Commissioner
Docket Nos. 69245, 69246.
United States Tax Court
T.C. Memo 1960-218; 1960 Tax Ct. Memo LEXIS 72; 19 T.C.M. (CCH) 1219; T.C.M. (RIA) 60218; October 12, 1960
*72 Petitioners, partners in a business engaged in the construction and sale of residential houses, purchased two tracts of land, together with plans and permits, and built two 4-unit apartment buildings on each lot. The apartment units were rented as soon as they became tenantable; there were no sales activities in connection therewith; and on petitioners' books the rental income arising from the apartment buildings was segregated from the profits arising from the sale of residential houses. At varying times within a four-month period, averaging at least 11 1/2 months after their completion, petitioners sold the apartment buildings because of the need for additional capital which arose in connection with the subdivision and development activities of a related corporation from which they had received loans to finance the purchase and construction of the apartment buildings. Held, the four apartment buildings were not held primarily for sale to customers in the ordinary course of petitioners' business and gain realized from their sale constitutes capital gain. C. E. Lopez, Esq., Post Bldg., St. Matthews, Ky., for the petitioners. Arthur Clark, Jr., Esq., for the respondent. BRUCE Memorandum *73 Findings of Fact and Opinion BRUCE, Judge: These consolidated proceedings involve deficiencies in Federal income tax determined against petitioners for the year 1955 as follows: Petitioners
Docket Nos.
Deficiencies
Edward Butler and
Emma Butler
69245
$3,266.22
Chester Cooper and
Ruby Cooper
69246
3,237.42 The sole issue is whether gain realized by petitioners upon the sale of four 4-unit apartment buildings is taxable as ordinary income or as capital gain. Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. Edward Butler and Emma Butler, husband and wife, and Chester Cooper and Ruby Cooper, husband and wife, all residing in Louisville, Kentucky, filed their respective joint Federal income tax returns for the year 1955 with the district director of internal revenue for the district of Kentucky. In about the year 1949 Edward Butler and Chester Cooper formed a partnership to engage in the business of residential construction. Edward Butler and Chester Cooper in their business relationship as partners will hereinafter be referred to as the petitioners. Petitioners' sales and end of year inventory for the years 1953 to 1955 were as follows: Houses
Houses
on Hand
Year
Sold
at End of Year
1953
6
2
1954
2
1955
12
16
On *74 April 9, 1952, petitioners organized a corporation under the firm name of Chester-Villa Development Co., Inc., hereinafter referred to as Chester-Villa, to engage in the business of residential construction and real estate development. Chester-Villa's sales and end of year inventory for its taxable years ended September 30, 1953, 1954, and 1955, were as follows: Inventory at end
of Taxable Year
Lots
Houses
Year
Sold
Sold
Lots
Houses
1953
12
11
22
5
1954
14
12
31
6
1955
5
26
1 On January 11, 1954, and February 15, 1954, petitioners purchased two tracts of real estate located on opposite corners of Marshall Drive at the intersection of Shelbyville Road, Louisville, Kentucky, together with the necessary plans and permits with which to build four 4-unit apartment buildings. Shortly thereafter they commenced construction of said apartment buildings, two on each of the two tracts of land. These apartment buildings are hereinafter referred to by their respective addresses of 100, 101, 102, and 103 Marshall Drive. The two apartment buildings located at 101 and 103 Marshall Drive were completed prior to May 4, 1954; those located at 100 and 102 Marshall Drive were completed prior to May 28, 1954. The total cost *75 of the four buildings, including the cost of land, plans, permits, and construction, was $138,523.91. The petitioners had some cash with which to begin construction, but the cost of the four buildings was financed principally by loans. In this connection petitioners borrowed $25,000 from the First National Bank, a total of $95,000 from the Langen Corporation, and a net amount of $28,000 from Chester-Villa. The loans from Langen Corporation were negotiated by issuing two promissory notes, one in the amount of $50,000, dated May 4, 1954, to be repaid in monthly installments of $395.50 over a period of 15 years, which was secured by a mortgage on 101 and 103 Marshall Drive; and the other in the amount of $45,000, dated May 28, 1954, to be repaid in monthly installments of $355.88 over a period of 15 years, which was secured by a mortgage on 100 and 102 Marshall Drive. The loan from the First National Bank was repaid on June 1, 1954. The following schedule reflects loans and repayments by petitioners to Chester-Villa: 1954
Security
Loans
Repayments
Balance
March
Demand note
$20,000
$20,000
April
Demand note
18,000
38,000
May
$10,000
28,000
October
Demand note
1,500
29,500
November
8,000
21,500
December
Demand note
10,000
31,500
1955
January
Demand note
2,000
33,500
March
5,500
28,000
April
Demand note
2,500
30,500
May
2,500
28,000
September
14,000
14,000
November
6,000
8,000
December
1,000
7,000
As *76 the apartment units were completed and became tenantable, the petitioners rented them at monthly rentals of from $100 to $115. The J. Ashby Miller Co. was employed as rental collection agent and, after retaining commissions amounting to 3 per cent of the gross rentals, remitted rents totaling $19,373.72 to the petitioners for the years 1954 and 1955 as follows: 1954
1955
January
$1,656.75
February
1,556.85
March
$ 690.00
1,668.40
April
540.81
1,157.15
May
345.00
945.85
June
1,390.55
388.00
July
1,210.94
August
1,212.50
September
1,431.50
October
2,009.95
November
1,612.62
December
1,556.85
Petitioners did not possess any other rental properties during the years 1954 and 1955. Petitioners equipped the apartment units with dishwashers, disposals and laundry trays; these items were not provided in the residential houses which they built. Most of the petitioners' sales of real estate and the sales of Chester-villa were negotiated by Harry W. Neal, a licensed realtor, who was associated with the real estate brokerage firm of J. Ashby Miller Co. "For Sale" signs were placed at the site of petitioners' residential houses during the period of their construction; such signs were not used in connection with the four apartment *77 buildings. Petitioners received at least one bona fide offer to purchase any of the apartment buildings prior to their sale. This offer was rejected by petitioners. On November 12, 1954, Chester-Villa entered into a contract to purchase 25.274 acres of undeveloped real estate located on Hikes Lane, Louisville, Kentucky, at a cost of $58,441.20. This property was financed by Chester-Villa as follows: (a) Cash in the amount of $500 was paid upon execution of the contract to purchase; (b) Cash in the amount of $17,250.06 was paid to the vendors by Chester-Villa on December 30, 1954; (c) Chester-Villa executed promissory notes to the vendors in the aggregate amount of $40,691.14 at 4 per cent interest, the principal of which was to be repaid in three annual installments of $13,563.71, $13,563.71 and $13,563.72, respectively. In connection with this purchase the petitioners and/or Chester-Villa secured a line of credit for $90,000 from the Citizens Fidelity Bank. Individual lot sales reduced the need of money to the extent that only $80,000 of this credit was used. Petitioners sold the four 4-unit apartment buildings as follows: Date
Gross
Apartment
Sold
Sales Price
100 Marshall Drive
4/25/55
$41,000
101 Marshall Drive
6/ 6/55
40,000
102 Marshall Drive
5/25/55
41,500
103 Marshall Drive
3/18/55
40,000
*78 Petitioners sold the four apartment buildings because of the need for additional capital which arose when Chester-Villa became involved in the purchase, subdivision, and development of the Hikes Lane property. The four apartment buildings were not held by petitioners as property primarily for sale to customers in the ordinary course of their trade or business. Opinion The sole issue presented is whether the gain realized from the sale of four 4-unit apartment buildings is taxable as capital gain or as ordinary income, with determination of this in turn restricted to whether such property was held by petitioners "primarily for sale to customers in the ordinary course of [their] trade or business" within the meaning of sections 1221[1] *79 and 1231, [2] Internal Revenue Code of 1954. Whether or not the apartment buildings were held primarily for sale in the ordinary course of petitioners' business is a question of fact, Raymond Bauschard, 31 T.C. 910, affd. 279 F. 2d 115; Rubino v. Commissioner, 186 F. 2d 304, certiorari denied 342 U.S. 814; Solly K. Frankenstein, 31 T.C. 431, which is resolved with the aid of certain well established tests which have often been stated by this and other Courts. See Raymond Bauschard, supra; W. T. Thrift, Sr., 15 T.C. 366; Boomhower v. United States, 74 F. Supp. 997. *80 Their restatement here would serve no useful purpose. Suffice it to say that no single factor is determinative of the issue and the facts must be viewed in their entirety. Bauschard v. Commissioner, 279 F. 2d 115, affirming 31 T.C. 910; James G. Hoover, 32 T.C. 618; W. T. Thrift, Sr., supra. It is well established that a dealer in real estate may occupy a dual role - he may be a dealer with reference to some of his properties and an investor as to others. Eline Realty Co, 35 T.C. 1; Charles E. Mieg, 32 T.C. 1314; D. L. Phillips, 24 T.C. 435; Walter R. Crabtree, 20 T.C. 841; Nelson A. Farry, 13 T.C. 8. Petitioners were actively engaged in the construction and sale of residential houses. They both testified that they acquired the land and built the apartment buildings thereon as an investment - for security and rental income. The apartment buildings were the only rental property petitioners possessed during the years 1954 and 1955. The rental income arising therefrom was segregated from the profits arising from their sale of residential houses. In connection with the apartment buildings petitioners employed long-term financing, in contrast with the short-term loans customarily *81 used by them in the construction of residential houses. They made affirmative efforts to sell the residential houses, witness the "For Sale" signs placed at the site of such houses during their construction, but they made no efforts to sell the apartment buildings and apparently "For Rent" rather than "For Sale" signs were used in connection therewith. While their residential houses were generally sold immediately upon, or even prior to, completion, the apartment buildings were rented as soon as each unit became tenantable. In fact, petitioners held the apartment buildings for periods ranging from 10 to 13 months or for an average period of at least 11 1/2 months prior to selling them and throughout the period during which petitioners held them they were rented almost continuously. Petitioners sold the apartment buildings because of the need for additional capital. Chester-Villa, their related corporation, had purchased undeveloped land on Hikes Lane for purposes of subdivision and development, but its capital was inadequate to proceed with such plans. By selling the apartment buildings petitioners hoped to provide some of the necessary capital by repaying the loans which Chester-Villa *82 had made to petitioners to finance their apartment buildings. Upon consideration of the entire record we hold that the apartment buildings were held primarily as rental investment property rather than for sale to customers in the ordinary course of petitioners' business. The expressed intent of the petitioners, the difference in their treatment of the apartment buildings and the residential houses, the segregation of the income accounts, the absence of sales activities with respect to the apartment buildings, and the immediate occupancy and almost continuous rental for a period averaging at least 11 1/2 months, compel this conclusion. Decisions will be entered for the petitioners. Footnotes
1. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *↩
2. SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS. * * *
(b) Definition of Property Used in the Trade or Business. - For purposes of this section - (1) General Rule. - The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not - * * *
(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *↩