J. Stewart Mathews and Viola I. Mathews v. Commissioner. J. Stewart Mathews v. Commissioner.
Mathews v. Commissioner
Docket Nos. 83593, 83594.
United States Tax Court
T.C. Memo 1961-213; 1961 Tax Ct. Memo LEXIS 136; 20 T.C.M. (CCH) 1058; T.C.M. (RIA) 61213; July 19, 1961
*136 Held, respondent did not err in determining that properties sold by petitioner were held by him primarily for sale to customers in the ordinary course of business. K. G. Seitz, Esq., 4321 Hamilton Ave., Cincinnati, Ohio, and William H. Nieman, Esq., for the petitioners. Donald P. Krainess, Esq. , and Gene E. Hutson, Esq., for respondent. BLACK Memorandum Findings of Fact and Opinion Respondent has determined deficiencies in the income tax of *137 petitioners for the years 1955 and 1956, as follows: Dkt. No.
Year
Petitioner
Deficiency
83593
1955
J. Stewart Mathews and Viola I. Mathews
$ 19,231.12
83594
1956
J. Stewart Mathews
168,812.89
The adjustment giving rise to the deficiencies was explained in the statutory notice for 1955, as follows: (a) and (b) It is held that Florida real estate sold during the year in question was not a capital asset as defined by section 1221 of the 1954 Internal Revenue Code as the property was held primarily for sale to customers in the ordinary course of your trade or business, and that the gains resulting from such sales should be treated as ordinary income, as computed in the attached exhibits A and B. A similar explanation appears in the statutory notice for 1956, except that it refers also to some real estate sales in California. The issue, then, is whether respondent erred in determining that profits realized by the petitioners from sales of real estate in Florida and California during 1955 and 1956 are taxable as ordinary income. Findings of Fact A stipulation of facts filed by the parties is incorporated herein by this *138 reference. [1]
Petitioners J. Stewart Mathews and Viola I. Mathews, husband and wife residing in Wyoming, Ohio, filed a joint income tax return for the taxable year 1955, and petitioner J. Stewart Mathews filed an individual income tax return for the taxable year 1956, with the district director of internal revenue, Cincinnati, Ohio. For convenience, J. Stewart Mathews will hereinafter be referred to as petitioner. Petitioner is engaged in the general practice of medicine in Wyoming, Ohio, a suburb of Cincinnati. He has practiced medicine for about 35 years, and is now associated with nine other doctors. Petitioner is one of the senior partners of the association. He is a member of the staffs of five hospitals, and has been and is active in many public service and charitable organizations closely related to the practice of medicine. Since about 1926, petitioner has vacationed *139 in Florida, generally several times a year. As a consequence, he became familiar with real estate in that state. In 1945, petitioner purchased three lots in Delray Beach, Florida, with the intent to erect a home for himself on one of the lots. In 1949, petitioner purchased another lot in Delray Beach. Commencing in 1951, petitioner purchased numerous properties in Florida and in California either in an individual capacity, in joint ventures with other persons, or as a member of and/or trustee for various syndicates. The number of such purchases during the years 1951 through 1959, is as follows: Indi-
Joint
Syndi-
vidual
Venture
cate
Pur-
Pur-
Pur-
Year
chases
chases
chases
Total
1951
6
0
0
6
1952
7
0
1
8
1953
3
3
0
6
1954
9
1
1
11
1955
10
2
4
16
1956
4
5
6
15
1957
0
0
3
3
1958
2
0
1
3
1959
2
2
2
6
Total
43
13
18
74
These purchases included individual lots, blocks of lots, and tracts of land ranging in size from 5 to 4,200 acres. The lands purchased in Florida were located in Brevard, Hendry, Indian River, Martin, Palm Beach, Putnam, St. Lucie, and Volusia Counties in or near such towns *140 or cities as Boca Raton, Boynton Beach, Delray Beach, Jupiter Island, Lake Worth, New Smyrna, Palatka, Palm Beach, San Mateo Heights, St. Augustine, St. Lucie, Stuart, Titusville, and Vero Beach. The lands purchased in California were located in San Clemente, Palm Springs, and Santa Barbara, in Orange, Riverside, and Santa Barbara Counties, respectively. Petitioner sold no properties in 1951, but made numerous sales in the years 1952 through 1959, either in an individual capacity, in joint ventures, or as a member of the various syndicates. The number of such sales made during the years 1952 through 1959 is, as follows: Indi-
Joint
Syndi-
vidual
Venture
cate
Year
Sales
Sales
Sales
Total
1951
0
0
0
0
1952
4
0
0
4
1953
6
1
0
7
1954
9
0
1
10
1955
12
1
0
13
1956
12
2
3
17
1957
1
3
4
8
1958
5
2
2
9
1959
3
5
12
20
Total
52
14
22
88
The holding periods for all Florida and California properties sold by petitioner during the years 1952 through 1959 are summarized as follows: Number
Holding Period
of Sales
0-6 months
0
6 months to 1 year
17
1 year to 2 years
21
2 years to 3 years
23
3 years to 4 years
16
Over 4 years
11
*141 The properties so sold were pieces of lots, single lots, single or several lots sold out of larger blocks of lots which had been purchased, footage or small acreage sold out of larger tracts, and whole tracts or large segments thereof. When petitioner had insufficient cash to make a purchase of property in his own name, he would make a cash deposit and then contact other parties who had previously indicated interest for the purpose of forming a syndicate to purchase the land. During the years 1952 through 1959, petitioner organized 13 syndicates. The years of organization, names of the syndicates, properties purchased, number of members, purchase price of properties, and petitioner's interest in those syndicates are as follows: No. of
Total
Syndicate
Mem-
Purchase
Petitioner's
Year
Name
Properties Purchased
bers
Price
Interest
1952
Island
N 4000feet, Sec. 21 & 22,
T. 36, R. 41, St.
Lucie City, Fla.
6
$100,955.72
1/6
1954
Missile
94 Acres, Brevard Co., Fla.
5
58,229.27
10.00%
1955
Indiantown
2700 Acres, Martin Co.,
7
136,875.72
1/3
Fla.
Ranch
1955
Sugarland
3350 Acres, Palm Beach Co.,
4
168,364.28
35.00% *
Fla.
1955
Warfield
1061 Acres, Martin Co.,
8
80,309.89
56.00%
Fla.
Highway
1955
Twenty Mile
1240 Acres, Palm Beach Co.,
4
99,332.50
2/3
Fla.
Bend
1956
Palatka
Lots 1-10 Hertyville
3
63,988.00
50.00%
subdivision, Lots 1-23 &
28-52 Wideman subdivision,
Putnam Co., Fla.
1956
Inland
2067 Acres, Martin Co.,
6
105,538.35
31.45%
Fla.
1956
Florida
1257 Acres (2 tracts)
Martin Co., 2465
Diversified
Acres, Palm Beach Co., 36
25
288,093.81
63,697%
Acres, Brevard Co., Fla.
1957
South East
3,697 Acres, Martin Co.,
38
40,287.83
67,997%
Fla.
Florida
1957
Corner
4,200 Acres, Martin Co.,
7
472,700.99
1/9
Fla.
1959
Park Ridge
1,573 Acres, Martin Co.,
3
211,695.00
50.00%
Fla.
1959
Cambridge
620 Acres, Martin Co., Fla.
4
76,531.95
1/3
*142 Petitioner served as sole trustee and manager of each of the syndicates. Each syndicate was organized to purchase and hold "property for investment and resale, and not for improvement or development." As sole trustee for each of the syndicates, petitioner looked after the maintenance of the properties, handled any renting or income arrangements, personally executed documents and arranged the details with respect to purchases and sales of properties, kept records of disbursements and receipts maintaining separate bank accounts for each syndicate, handled all correspondence with respect to syndicate properties, and rendered accountings and annual statements to the members with respect to syndicate operations. During the years 1953 through 1959, petitioner also engaged in 13 joint ventures for the purchase and sale of real estate. In these joint ventures, petitioner exercised managerial functions similar to those he performed for the syndicates. During the years 1953 through 1957, Southern Florida experienced a land "boom" and areas in which petitioner purchased properties showed large *143 increases in land values. Although petitioner did not personally advertise properties for sale, he listed many properties for sale either with brokers exclusively or through a real estate listing bureau. He provided brokers with information concerning properties he had for sale, and negotiated with purchasers whom brokers located. In August 1953, petitioner wrote to a real estate broker about one tract of land, saying, "We can hold it for a long pull if necessary, but if there is any [good offer] coming down that way we might as well grab it." On December 8, 1953, petitioner listed two lots for sale with the Real Estate Listing Bureau, Inc., of Delray Beach, Florida. In May 1954, he notified a real estate broker that he had removed a property from the Listing Bureau and given the broker an exclusive listing "so that you may feel justified in erecting a sign on the property." On May 1, 1954, petitioner contacted a real estate subdivider offering certain property for sale. On September 2, 1955, petitioner wrote a real estate broker in Florida that "[it] would be alright to arrange for closing the deal on the 10 acre tract on Military Trail which you sold some months ago, but which *144 I did not want closed until after Sept. 25th, because it will not be six months until the 25th." On the same day he wrote to another broker, asking: "What do you think is wrong with the lot on MacFarlane Ave.? It seems to me it should move." On September 9, 1955, petitioner listed two separate tracts of land for sale with another broker. Petitioner purchased properties in San Clemente, California, in May 1954 and 1955. In July 1956, he wrote a real estate broker in San Clemente offering several properties in San Clemente for sale. Petitioner engaged in extensive correspondence with real estate brokers and others regarding various aspects of the purchase and sale of his real estate. He utilized the services of an accountant to assist him in the maintainance of books and records relative to the properties, and in the preparation of annual reports to the members of syndicates. Petitioner frequently financed his purchases of real estate by small down payments and large mortgages. Upon occasion he found it necessary to sell properties in order to meet payments due on others or to purchase new ones. Substantially all of petitioner's money was tied up in real estate. During the years *145 1955 and 1956, petitioner made 30 completed or installment sales of property in Florida and California. The properties, the periods for which they were held prior to sale, whether they represented sales out of larger tracts which petitioner had originally acquired, the nature of petitioner's interest in the property, the percentage of cost which the gain represented, [2] the method of payment (if known), and sales commissions paid, were as follows: Holding Period
Part of
Larger
Property
Yrs.
Mos.
Days
Tract
1955
15 acres on Barwick
Road, Fla.
0
8
23
Yes
60 acres on McDonald
Tract, Fla.
2
2
25
No
S 1/2 of W 1/2 of SW
1/4, Sec. 11, Fla.
0
7
21
No
17.28 acres, Thompson
Tract, Fla.
0
10
21
Yes
Lots 25 & 26, Yacht
Club Beach, Fla.
3
3
8
Yes
Balance of Thompson
Tract, Fla.
1
9
12
Yes
40 acres, Gauge Tract,
Fla.
0
11
2
No
Installment Sales
5 acres, Gauge Tract,
Fla.
0
11
2
No
Lot 27, Yacht Club
Beach, Fla.
2
11
27
Yes
Klingensmith Tract,
Fla.
0
9
4
No
200feet govt. lands, Lot 3
3
8
2
Lots B & C, Pitchford
No
Lands
3
1
28
50 acres, Boynton
No
Beach, Fla.
0
8
2
No
Cedar Knolls Tract,
Fla.
2
4
6
No
1956
18 acres, Palm Beach
Co., Fla.
2
7
25
Yes
Reid Village lot, Del-
ray Beach, Fla.
4
10
14
Yes
100feet W. Side U.S. #1,
Jupiter Island, Fla.
1
9
4
Yes
400feet W. Side U.S. #1,
Jupiter Island, Fla.
2
1
1
Yes
Lots 154-159, Jupiter
Island, Fla.
1
8
3
No
S. 165feet govt. lot #4,
sec. 27
0
7
2
No
36 lots, San Clemente,
Calif.
2
4
18
No
320 acres, Sec. 28 &
33, Palm Beach
Co., Fla.
1
6
10
Yes
Sec. 15 & 32, S.W.
Martin Co., Fla.
1
0
23
No
Installment Sales
100feet W. Side U.S. #1,
Jupiter Island, Fla.
2
7
2
Yes
Hood Road property,
Palm Beach, Fla.
0
9
27
No
64 acres, Palm Beach
Co., Fla.
1
6
10
Yes
329feet W. Side U.S. #1,
Jupiter Island, Fla.
2
7
21
Yes
Lot #7, Gomes Grant,
E. India River
0
6
1
No
2200feet, St. Augustine,
Fla.
2
11
6
No
1320feet Titusville, Fla.
1
1
25
No
125feet in Sec. 20 & 21, 43
1
0
0
Yes
& 49, Palm Beach Co., Fla.
*146 Sales
Nature
% of
Method of Pay
Commission
Property
of Interest
Gain
ment (if shown)
Paid
1955
15 acres on Barwick
Road, Fla.
Individual
75.39
$ 835.65 *
60 acres on McDonald
Tract, Fla.
Individual
102.71
Cash
3,242.59 *
S 1/2 of W 1/2 of SW
1/4, Sec. 11, Fla.
Individual
76.55
586.25 *
17.28 acres, Thompson
Tract, Fla.
Individual
99.89
15.30 *
Lots 25 & 26, Yacht
Club Beach, Fla.
Individual
216.87
0
Balance of Thompson
Tract, Fla.
Individual
48.26
3,871.42 *
40 acres, Gauge Tract,
Fla.
Individual
67.16
Cash & Mortgage
2,000.00
Installment Sales
5 acres, Gauge Tract,
Fla.
Individual
65.91
Cash & Mortgage
250.00
Lot 27, Yacht Club
Beach, Fla.
Individual
110.63
Cash & Mortgage
300.00
Klingensmith Tract,
Fla.
Individual
77.47
Cash & Mortgage
1,980.00
200feet govt. lands, Lot 3
Lots B & C, Pitchford
Individual **
Lands
194.34
Cash & Mortgage
4,615.00
50 acres, Boynton
Individual
Beach, Fla.
Individual
66.11
Cash & Mortgage
1,950.00
Cedar Knolls Tract,
Fla.
Joint Venture
102.64
Cash & Mortgage
1,800.00
1956
18 acres, Palm Beach
Co., Fla.
Individual
128.19
0
Reid Village lot, Del-
ray Beach, Fla.
Individual
80.63
Cash
$ 974.88 *
100feet W. Side U.S. #1,
Jupiter Island, Fla.
Individual
117.37
869.75 *
400feet W. Side U.S. #1,
Jupiter Island, Fla.
Individual
120.13
3,372.51 *
Lots 154-159, Jupiter
Island, Fla.
Individual
102.12
***
27,737.90 *
S. 165feet govt. lot #4,
sec. 27
Individual
19.54
3,381.51 *
36 lots, San Clemente,
Calif.
Individual
70.25
2,879.22 *
320 acres, Sec. 28 &
33, Palm Beach
Co., Fla.
Individual
167.81
10,302.02 *
Sec. 15 & 32, S.W.
Martin Co., Fla.
Syndicate
40.35
Cash & Mortgage
15,500.00
Installment Sales
100feet W. Side U.S. #1,
Jupiter Island, Fla.
Individual
192.11
Cash & Mortgage
0
Hood Road property,
Palm Beach, Fla.
Individual
31.55
Cash & Mortgage
7,800.00
64 acres, Palm Beach
Co., Fla.
Individual
398.38
Cash & Mortgage
3,600.00
329feet W. Side U.S. #1,
Jupiter Island, Fla.
Individual
219.06
Cash & Mortgage
3,575.00
Lot #7, Gomes Grant,
E. India River
Joint Venture
78.95
Cash & Mortgage
2,600.00
2200feet, St. Augustine,
Fla.
Joint Venture
123.84
Cash & Mortgage
11,000.00
1320feet Titusville, Fla.
Syndicate
83.61
Cash & Mortgage
11,935.00
125feet in Sec. 20 & 21, 43
Syndicate
78.78
Cash & Note
2,000.00
& 49, Palm Beach Co., Fla.
*147 The average holding period for properties sold in 1955 was approximately 1 year 9 1/2 months. The percentage of total cost of all properties sold in that year which the total gain thereon represented was 94.67 percent. [3] The average holding period for the properties sold in 1956 was approximately 1 year 10 1/2 months. The percentage of the total cost of all properties sold in that year which the total gain thereon represented was 88.91 percent. [4] During the years in issue, petitioner reported income from real estate sales, the practice of medicine, and miscellaneous sources, as follows: Sales of
Practice of
Miscel-
Year
Real Estate
Medicine
laneous
1955
$ 72,306.05
$29,701.39
$13,711.49
1956
284,406.24
33,433.23
14,998.47
*148 Payments received on leases of mineral rights and other rentals derived from the properties in Florida and California (which are included in the figures for miscellaneous income) were $1,015 and $1,145.09 for 1955 and 1956, respectively. Petitioner acquired all of the Florida and California properties sold during 1955 and 1956 in 1951 or subsequent years. He held them primarily for sale to customers in the ordinary course of his business. Opinion BLACK, Judge: The sole issue presented is whether respondent erred in determining that profits realized by petitioner from sales of real estate in Florida and California during the taxable years 1955 and 1956 are taxable as ordinary income, rather than as long-term capital gains. Respondent has determined that the properties were not capital assets as that term is used in section 1221(1) [5] of the 1954 Code in that they were held primarily for sale to customers in the ordinary course of business. Petitioner contends that the properties were not so held and that he was not engaged in the business of selling properties. *149 "It is well settled that the question of whether property sold by a taxpayer at a profit was property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, within the meaning of the statute, is essentially a question of fact." Bauschard v. Commissioner, 279 F. 2d 115, 117 (C.A. 6, 1960), affirming 31 T.C. 910. A brief restatement of the principles applicable to such a determination was set forth in Kaltreider v. Commissioner, 255 F. 2d 833, at 838 (C.A. 3, 1958), as follows: No single factor or test is dispositive. Factors considered are: (1) the purpose for which the property was acquired; (2) the purpose for which it was held; (3) improvements, and their extent, made to the property by taxpayer; (4) frequency, number and continuity of sales; (5) the extent and substantiality of the transactions; (6) the nature and extent of taxpayer's business; (7) the extent of advertising to promote sales, or the lack of such advertising; and (8) listing of the property for sale directly or through brokers. [Annotations omitted.] Although petitioner testified that he had acquired some of the properties *150 sold as possible homesites and an agricultural diversion for his retirement years, evidence as to the dates of purchase and sale of some of the tracts, the multiplicity and geographical diversity of such purchases, correspondence concerning some of these properties, and the disparity (and in some cases, the magnitude) of their purchase price, lead us to believe that petitioner's recollection as to the purpose of acquisition was somewhat confused. In any event, "[while] the purpose for which the property was acquired is of some weight, the ultimate question is the purpose for which the property is held." Bauschard v. Commissioner, supra, 118. We have answered that ultimate question adversely to petitioner's contention in our Findings of Fact. The record, we think, amply supports respondent's determination. Petitioner, a busy and successful doctor, was also a busy and successful dealer in real estate. That a taxpayer actively practices his chosen profession does not prevent him from additionally engaging in another occupation. Cf. Bauschard v. Commissioner, supra, (involving a clergyman); Frankenstein v. Commissioner, 272 F. 2d 135 (C.A. 7, *151 1959), affirming 31 T.C. 431, (involving a lawyer). While petitioner made few improvements to the properties, he was not adverse to selling pieces of property out of larger tracts which he had purchased. It is clear from the record that petitioner continuously made numerous and frequent sales of property involving substantial sums of money. Petitioner was not a licensed real estate broker, but he listed numerous properties with such brokers. He did not advertise the properties personally, but he permitted brokers to advertise some of them. Over a 9-year period, he was instrumental in the formation of 13 real estate syndicates, six of which were formed during the years in issue. In both of the years in issue, petitioner realized substantially more income from his dealings in property than from his practice of medicine. Properties were purchased as others were sold; in some cases the sales were made to finance new purchases. In short, the record clearly shows that petitioner over a period of years, in which the years in issue are included, made numerous, frequent, and continuous purchases of real estate in Florida and California which he held for the purpose of selling *152 at the earliest moment for the highest price; and that he so occupied himself to such an extent that he was, in fact, a dealer in real estate, as well as a doctor of medicine. We hold, therefore, that respondent did not err in determining that petitioner's profits upon the sales of real estate in Florida and California were taxable as ordinary income. Decisions will be entered for the respondent. Footnotes
1. Two typographical errors of transposition appear in Exhibit 3-C attached to the Stipulation of Facts. On line 11, the figure in the column headed "Cost" reads "14 014.75", but should read "14 041.75." On line 29, the figure in the column headed "% of Profit" reads "40.9735", but should read "40.7935."↩
*. Petitioner's wife, not petitioner, was the member of syndicate; petitioner was trustee.↩
2. These figures should not be confused with the "% of profit" used in the computation of taxable gain under the installment method of reporting. a1 Sales expenses, no breakdown for commissions shown. a2 These properties were sold together although acquired separately. a3 Record shows payment of approximately one-half of price by mortgage, method of payment of remainder of purchase price not shown.↩
3. See footnote 2, supra. ↩
4. See footnote 2, supra.↩
5. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;↩