Maxine Development Company, Inc. v. Commissioner.
Maxine Development Co. v. Commissioner
Docket No. 766-62.
United States Tax Court
T.C. Memo 1963-300; 1963 Tax Ct. Memo LEXIS 44; 22 T.C.M. (CCH) 1579; T.C.M. (RIA) 63300; November 1, 1963
Michael Adilman (an officer), for the petitioner. James D. Burroughts, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined a deficiency in petitioner's income tax for the taxable year ended October 31, 1958 in the amount of $7,337.69. The issues are (1) whether gain realized by petitioner *45 from the sale of certain property is nonrecognized gain within the provisions of section 337 of the Internal Revenue Code of 1954; [1] (2) whether the gain is taxable as a long-term capital gain or as ordinary income; and (3) whether the amount of $3,128.19 received by petitioner in the taxable year ended October 31, 1958 is taxable as interest income. Findings of Fact Some of the facts were stipulated and they are so found. Maxine Development Company, Inc., hereinafter called the petitioner, was incorporated under the laws of the State of Florida on January 14, 1957. Petitioner maintains its office in Savannah, Georgia. Petitioner filed its Federal income tax return for the taxable year ended October 31, 1958 with the district director of internal revenue at Atlanta, Georgia. On December 15, 1956 [2] petitioner purchased a tract of property in Pinellas County, Florida, known as Pinebrook Subsection from the Chatham Development Company, a Florida corporation, for $52,000. Petitioner's stockholders were also the organizers and stockholders of Chatham *46 Development Company. Petitioner paid Chatham Development Company $5,000 and assumed mortgages against the property in the amount of $47,000. Petitioner acquired Pinebrook Subdivision with the intention of developing the land and selling it by lots or entering into a joint venture agreement with the George Davis Company (a construction company) of St. Petersburg, Florida, to build houses on the lots for resale. Petitioner employed S. C. Somerville of St. Petersburg, Florida, to handle all matters pertaining to the original development of the land, which included obtaining approval for the subdivision, platting, the laying and approval of water and sewage lines, and the paving of streets. Chatham Development Company owned other property and had entered into an agreement under which the George Davis Company would build houses on such property and pay Chatham Development Company for its lots as the houses were completed. Due to difficulties between the parties the arrangement was discontinued and the Chatham Development Company completed the project alone. As a result of these difficulties, the *47 petitioner decided not to enter into the contemplated arrangement with the George Davis Company and was unable to find another construction company that would enter into a suitable arrangement for constructing and selling houses on petitioner's property. S. C. Somerville left petitioner's employment in August 1957. On August 12, 1957, a meeting was held by petitioner's stockholders and after the difficulties encountered in the Florida venture were discussed, it was decided to authorize petitioner's president (Michael Adilman) to sell the Florida property. On August 25, 1957 a special meeting of petitioner's stockholders was held. The minutes of the meeting are, in part, as follows: The President stated that since the corporation would not continue in business that it was his suggestion that the corporation be liquidated. The following resolution was made and carried unanimously. "BE IT RESOLVED that Maxine Development Company, Inc., a corporation created, organized and existing under the laws of the State of Florida and by order of the Secretary of State of said state, dated January 14, 1957, surrender its charter and franchise to the State of Florida and be dissolved as a *48 corporation, and that the officers of said corporation be and they are hereby authorized, empowered and directed to take the necessary steps, in the name of said corporation, to effect the dissolution of the corporation and the surrender of its charter and franchise to the State of Florida on or before September 10, 1958. Such dissolution to be effective to comply with Section 337 of the United States Internal Revenue Code." On November 13, 1957 the petitioner sold to Gulf Housing Corporation, St. Petersburg, Florida, the tract known as Pinebrook Subdivision for $100,000. The petitioner received approximately $32,500 in cash and a mortgage for $67,500. The mortgage provided for four payments at intervals of six months from date of sale, with interest at 5 percent per annum on the principal balance remaining unpaid. Under the terms of the mortgage it was agreed that all payments would be applied first to interest and then to principal. It is stipulated that "[the] liquidating profit on the transaction was properly reported on the return for the year ending October 31, 1958, as being $21,330.76." On December 12, 1957 petitioner filed Form 966, which is an information return required *49 by section 6043 of the Internal Revenue Code of 1954 to be filed by corporations within 30 days after the adoption of resolution or plan of dissolution, or complete or partial liquidation. Attached to this form was a document entitled "CERTIFIED COPY OF RESOLUTION ADOPTED AND APPROVED BY STOCKHOLDERS OF MAXINE DEVELOPMENT COMPANY, INC. AT A MEETING HELD ON NOVEMBER 12, 1957, AT THE PRINCIPAL OFFICE OF BUSINESS, 307 INDUSTRIAL BUILDING, SAVANNAH, GEORGIA." The attached copy stated as follows: BE IT RESOLVED that Maxine Development Company, Inc., a corporation created, organized and existing under the laws of the State of Florida and by order of the Secretary of State of said state, dated January 14, 1957, surrender its charter and franchise to the State of Florida and be dissolved as a corporation, and that the officers of said corporation be and they are hereby authorized, empowered and directed to take the necessary steps, in the name of said corporation, to effect the dissolution of the corporation and the surrender of its charter and franchise to the State of Florida on or before November 10, 1958. Such dissolution to be effective to comply with Section *50 337 of the United States Internal Revenue Code. We hereby certify that the above is a true and accurate copy of the resolution adopted and approved by the stockholders of Maxine Development Company, Inc., on November 12, 1957. On October 11, 1958 a special meeting of petitioner's directors and stockholders was held. The minutes state that "[the] president reported that pursuant to the resolution of the meeting held on August 25, 1957 directing him to effect the dissolution of the corporation", the single tract of land had been sold at a profit, but that it had been impossible to return to the stockholders in cash all of their investment and profit because of the payments due over a period of two years. The minutes then state, as follows: In view of this and in order to effect the liquidation the president suggested that as of this date all of the remaining assets and liabilities of the corporation be assigned to the stockholders on a prorata basis so that the liquidation could be completed and it was also suggested that the corporate bank account be maintained until such time as all of the money had been collected and distributed so as to avoid complications with the buyers *51 of the land. A motion was duly made and seconded that this procedure be adopted and the motion unanimously voted favorable. The assets distributed at this time consist of a mortgage receivable and the liabilities to be paid as funds are received, are for sales commission, a loan payable of $1,500.00, and a mortgage payable of $16,000.00. The balance of all funds as received will be distributed to the stockholders in addition to the $15,000.00 which have been distributed during the year. The mortgage receivable of Gulf Housing Corporation remained recorded in petitioner's name. The petitioner continued to make collections on the mortgage and to deal with the mortgagor. As collections were made by petitioner on the mortgage, distributions were made to the stockholders. The mortgage was not paid in full by Gulf Housing Corporation and in January 1961 petitioner brought foreclosure proceedings against Gulf Housing Corporation in connection with four improved lots and seven other lots on which there were seven incomplete houses. Petitioner has resold four of the lots obtained by foreclosure proceedings in 1961. Petitioner's charter is still in existence and it has continued to file *52 annual reports and pay capital stock tax to the State of Florida. During the taxable year ended October 31, 1958 petitioner received three payments totaling $11,250 from Gulf Housing Corporation. These payments were first applied by petitioner to outstanding interest and the remainder to the principal of the mortgage. A total of $3,128.19 was applied to interest during the fiscal year ended October 31, 1958. In its return for the taxable year ended October 31, 1958 the petitioner did not include in taxable income the gain of $21,330.76 realized from the sale of Pinebrook Subdivision. Petitioner did not report any interest income in the return for that taxable year. Respondent determined that petitioner (1) realized ordinary income in the amount of $21,330.76 from the sale of the property in the fiscal year 1958 and (2) realized interest income of $3,128.19 in the fiscal year 1958. Opinion Section 337(a) provides that if "(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets *53 retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period." Petitioner is not entitled to the benefits of section 337(a) since it has not only failed to show that it made any distribution of assets whatever within the requisite 12-month period, but has even failed to show a complete liquidation of all its assets (less assets to meet claims) within the meaning of the statute. At the outset, there seems to be some confusion as to the exact date when petitioner adopted a plan of liquidation. Usually this confusion exists because of a dearth of corporate documents, but here we have a profusion of such documents. There are in evidence copies of the minutes of meetings held on August 12 and 25, 1957 by petitioner's stockholders. At the latter meeting a resolution was adopted to dissolve the petitioner-corporation, and section 337 is specifically mentioned in the resolution. Also in evidence is a copy of the minutes of a meeting of petitioner's stockholders on October 11, 1958 which expressly refers to the meeting of August 25, 1957 at which the resolution was adopted to dissolve the petitioner-corporation. *54 Michael Adilman, petitioner's president, was the only witness, and he merely stated that the date on all these minutes of the various meetings are wrong in showing August 25, 1957 as the date the liquidation plan was adopted. He testified that the original minutes were lost and that an employee prepared substitute minutes, all with incorrect dates, from the files. Adilman was asked on cross-examination why he signed the substitute minutes of the three separate meetings if they had wrong dates, and his response was that "I assumed they were right. I didn't even read them." Petitioner claims that the plan of dissolution was adopted on November 12, 1957. All we have to support this is a copy of a resolution purportedly adopted on that date to dissolve petitioner. This copy was attached to a Form 966 filed by petitioner with the district director on December 12, 1957. Respondent indicates that while the revenue agent found all the other minutes of the various meetings he never found the minutes of any stockholders' meeting held on November 12, 1957, and Adilman failed to explain their absence from the corporate books and records. On this record we find that petitioner adopted a plan *55 of complete liquidation on August 25, 1957. The record is clear that the first possible distribution of assets by petitioner to its stockholders took place about October 11, 1958, more than 12 months after the adoption of the corporate dissolution plan. It is obvious that the requirements of section 337(a) are not met. It also appears that petitioner stayed in existence for several years after 1958 to collect payments on a $67,500 mortgage resulting from the sale by petitioner of its property on November 13, 1957. As collections were made by petitioner on the mortgage they were distributed to the stockholders. In 1961 petitioner brought a foreclosure action against the defaulting mortgagor, and petitioner later sold four of the repossessed lots. It is stipulated that petitioner's charter is still in existence and that petitioner has continued to file annual reports and pay capital stock tax to the State of Florida. It is quite obvious that, even if we should accept petitioner's contention that it adopted its plan of dissolution on November 12, 1957, there was no distribution of all of petitioner's assets "in complete liquidation" within a 12-month period beginning on that date. Section *56 337(a). We hold for respondent on this issue. The next issue is whether the gain of $21,330.76 realized by the petitioner from the sale of the tract known as Pinebrook Subdivision in November 1957 is taxable as capital gain or ordinary income. The issue turns upon whether the property was held by petitioner at the time of sale primarily for sale to customers in the ordinary course of its trade or business or as an investment. Section 1221; Raymond Bauschard, 31 T.C. 910, affd. 279 F. 2d 115. The question is one of fact. Petitioner purchased Pinebrook Subdivision, a tract of land in Florida, on December 15, 1956. Petitioner's president testified that, when petitioner purchased the tract, it was with the intention to "[either] sell it by lot, or enter into a joint venture agreement with [a building contractor] where we would participate in the profits of building houses." Petitioner employed S. C. Somerville to handle all matters pertaining to the development of the tract, such as obtaining approval for the subdivision, platting lots, paving streets and installing water and sewage lines. Somerville worked in this capacity until August 1957. In August *57 1957 petitioner decied not to continue with the development but to sell the tract as soon as possible since it was not able to secure the services of a suitable building contractor. The tract was sold in November 1957 for $100,000. Petitioner's president testified "I don't recall just what stage of completion we had reached when we sold it." There can be no doubt on this record that the tract was held by petitioner at all times for sale to customers in the ordinary course of its trade or business. No other purpose appears. It is immaterial that the sale was made of the tract in its entirety. This mode of disposition does not change the character of the profit from ordinary income to capital gain. Donald J. Lawrie, 36 T.C. 1117. In the Lawrie case, supra, this Court stated that "[the] fact that petitioner disposed of the lots 'in bulk' does not change the manner in which they were 'held' by him, namely, for sale to customers in the ordinary course of his trade or business." See also Estate of Jacques Ferber, 22 T.C. 261. We find that the tract was held by petitioner for sale to customers in the ordinary course of trade or business, and we hold that the *58 gain realized by petitioner from the sale of such property is taxable as ordinary income. The last issue is whether certain payments received by petitioner from the mortgagor during the fiscal year 1958 are taxable as interest income. Petitioner received a mortgage for $67,500, providing for payments of $15,000 at 6-month intervals beginning on the date of sale and for interest at 5 percent on any unpaid balance, when it sold its property in November 1957. Petitioner received three payments during its fiscal year ending October 31, 1958 from the mortgagor totaling $11,250. In a schedule attached to a letter written by petitioner's president to the mortgagor on November 20, 1959 the application of the three payments made in the fiscal year 1958 is shown as follows: Payments Made
Note
Balance
Interest
New
Balance
Date
Amount
Due
Due
Balance
$67,500
7/22/58
$5,000
$62,500
$2,256.25
$64,756.25
9/ 4/58
5,000
57,500
395.74
60,151.99
10/31/58
1,250
56,250
476.20
59,378.19
The schedule shows a total of $3,128.19 applied to interest. This is the amount which respondent contends is includable in petitioner's income as interest *59 for the fiscal year 1958. We agree with respondent. Petitioner admits on brief that under the law of Florida (absent a specific agreement by the parties) and under the mortgage itself the payments by the mortgagor were first applicable to interest due, and then to principal. But it argues that the "mortgagor in this case did not live up to the terms of the mortgage and the [petitioner] in anticipation of difficulties treated all payments as payment on principal." There is no merit whatever in petitioner's argument and, furthermore, it is not supported by the record. It was the clear intention of the parties to the mortgage to first apply payments to interest. Petitioner admits this. When the mortgagor made partial payments in the fiscal year 1958 petitioner, as indicated by the schedule, applied such payments first to interest due, then to principal. Petitioner has failed to show that $3,128.19 of the total paid by the mortgagor in the fiscal year 1958 was other than interest. See Estate of Daniel Buckley, 37 T.C. 664; James F. Keith, 35 T.C. 1130. We sustain respondent on this issue. Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. Both this date and the date of petitioner's incorporation have been stipulated.↩