Charles T. Grace and Grace E. Grace v. Commissioner.
Grace v. Commissioner
Docket Nos. 84055 and 87031.
United States Tax Court
T.C. Memo 1961-252; 1961 Tax Ct. Memo LEXIS 102; 20 T.C.M. (CCH) 1313; T.C.M. (RIA) 61252; August 31, 1961
William H. Kinsey, Esq., Trade Bldg., Portland, Ore., for the petitioners. James D. Webb, III, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: The respondent determined deficiencies in petitioners' income tax for the years 1955, 1956, 1957, and 1958, in the amounts of $3,443.27, $12,124.16, $2,738.87, and $3,504.68, respectively. The issues for decision are: (1) Whether apartment houses owned by petitioners should be depreciated on the basis of an economically useful life of 50 years as determined by respondent, or on the basis of 30 years from date of construction for new apartments and 25 years from date of acquisition of an apartment acquired by petitioners when it was 12 to 15 years old as claimed by petitioners. (2) Whether the gains on the sales by petitioners of an apartment building, a 28-acre tract referred to as the Cooke tract, a lot referred to as the Nevada lot, and petitioners' personal residence constituted ordinary income as determined by respondent or long-term capital gains as claimed by petitioners. (3) If it is held that *104 petitioners' personal residence was a capital asset, (a) whether an allocation of the cost of the new house acquired by petitioners upon the sale of their personal residence between business and personal use must be made in order to compute the amount of the gain realized on the sale of the old residence which may be deferred under section 1034 of the Internal Revenue Code of 1954, and (b) if such an allocation is required, whether the evidence of record is sufficient to show a proper basis for such allocation. (4) If petitioners' personal residence is held not to be a capital asset (a) whether section 1034 of the Internal Revenue Code of 1954 is applicable to the sale thereof and (b) if this section is not applicable, whether the substituted basis resulting from past applications of such section or the actual cost of the old residence should be used in determining the gain upon the sale of petitioners' personal residence. (5) Whether petitioners are entitled to deduct certain claimed charitable contributions. Findings of Fact The petitioners are husband and wife, residing in Portland, Oregon. They filed joint income tax returns *105 for the years 1955, 1956, 1957, and 1958 with the district director of internal revenue at Portland, Oregon. Charles T. Grace (hereinafter referred to as petitioner) is well known by reputation in Portland, Oregon, as a good builder of residences and apartment houses. Petitioner's primary business is the construction and sale of single-dwelling residences. Petitioner usually buys land, either individual lots or tracts which he subdivides, constructs family dwellings thereon, and sells a house and lot together to an individual purchaser. Occasionally, petitioner builds houses on lots owned by others. Petitioner also builds apartment houses which he rents. On his income tax returns for the 4 taxable years here involved, petitioner reported total receipts, total expenses, and net income for his house construction and apartment rental activities and total long-term capital gains as follows: House
Rental
Capital
Construction
Income
Gain
1955
Total receipts
$500,523.00
$ 63,716.56
Total expenses
470,372.27
59,026.23
Net income
$ 30,150.73
$ 4,687.33
$ 1,889.90
1956
Total receipts
$411,465.56
$ 81,196.51
Total expenses
402,183.02
74,198.53
Net income
$ 9,282.54
$ 6,997.98
$23,656.49
1957
Total receipts (including $6,589.52
interest income)
$168,539.52
$ 90,276.85
Total expenses
154,730.27
79,148.05
Net income
$ 13,809.25
$ 11,128.80
$ 2,292.03
1958
Total receipts (including $4,675.77
interest income)
$193,570.86
$117,112.76
Total expenses
186,359.07
110,383.25
Net income
$ 7,211.79
$ 6,729.51
$ 3,542.58
*106 Issue 1. Depreciation Petitioner has continuously held from the date of construction by him on land which he owned through and including the years herein involved the following apartment houses identified as to address, number of units and date of construction: Date
Number
construction
Address
of units
completed
2144 N.E. 20th Ave., Port-
land, Oregon
4
1952
3803-55 N. Lombard, Port-
land, Oregon
16
1947
4005-4069 N. Kerby Ave.,
Portland, Oregon
24
1943
2244 N.W. Overton, Port-
land, Oregon
8
1952
8400-8420 S.W. Canyon
Lane, Portland suburb
18
9/30/55
Beaverton, Oregon
32
6/30/57
Cedar Crest Apartments,
Portland, Oregon
14
5/ 1/58
Petitioner continuously owned from the dates of construction by him on land which he owned to the dates of sale the following apartment houses identified as to address, number of units, date of construction, and date of sale: Con-
Num-
struc-
ber
tion
of
com-
Date
Address
units
pleted
sold
1510 N.E. 65th Ave.,
Portland, Oregon
4
1952
July 1956
531-37, 609-15 N.E.
Church Street, Port-
land, Oregon
8
1952
Dec. 1956
In a trade on October 31, 1954, petitioner *107 acquired an apartment at 8106-8114 N. Fenwick, Portland, Oregon, having four units. This apartment on N. Fenwick was sold June 22, 1955. All of these apartment buildings were wooden frame construction with brick veneer on portions of the exteriors. The portions of the exteriors of these buildings which were not brick veneer were ordinary woodsiding. A brick building has solid brick walls about 8 inches thick which support the roof of the building whereas brick veneer is merely an outside facing on the wood frame sides which support the roof, giving the building a good appearance but not adding to its life. Other construction and location features for the individual buildings are as follows: 2144 NE 20th Avenue is of mediocre construction, average flooring, and below normal plumbing, resulting from necessity for keeping within loan limitations. It has a composition roof and is in an older neighborhood where the houses are 50 to 60 years old. It is in a fair rental district. 531-37, 609-15 NE Church Street. This building also was built within the limitations of a loan and was a little below average in construction. 4005-4069 N Kerby Avenue was completed in 1943 and consists *108 of 6 buildings containing 24 units. The property was below average generally but petitioner has kept it up fairly well. The City Planning Commission is considering tearing down everything in the area and turning it into a commercial area. 2244 NW Overton has the same construction as 2144 NE 20th Avenue. 8400-8420 SW Canyon Lane is of average construction. Petitioner is faced with the necessity of either cutting the rent on these apartments or upgrading them. Upgrading means raising the grade so as to be compatible with the new type of apartment now being built which has carpeting on the floors, drapes on the windows, a swimming pool and built-in ranges and ovens. Beaverton Apartments consist of a number of buildings. It has a total of 32 living units located in various parts of Beaverton, Oregon. These buildings are in a cheaper rental area with no swimming pool, drapes or carpeting, or modern equipment required for a first class apartment. The plumbing and other items are about third grade. Cedar Crest Apartments are of fairly good frame construction, but lack certain things demanded today for first class apartments such as swimming pools, wall to wall carpeting, drapes, and *109 the like. The location is good. 8106-8114 N Fenwick was not constructed by petitioner. It was an old apartment when acquired in 1954, being at least 12 to 15 years old. Its state of construction was such that petitioner was faced with the necessity of putting in a complete set of new plumbing and wiring, or selling the apartment. 1510 NE 65th Avenue is in a fair location and has about the same type of construction as NE 20th Avenue. All the apartments owned by the petitioner except 8400 SW Canyon Lane and Cedar Crest apartments are managed by Commerce Investment, Inc., Portland, Oregon (hereinafter referred to as Commerce Investment). Commerce Investment takes the responsibility for the routine operation of the buildings, including obtaining resident managers, the rental of the units, and maintenance of the furnace, plumbing and electrical repairs which is the part of the maintenance not performed by petitioner. Petitioner does the painting and decorating work for the apartments. The maintenance work for which Commerce Investment takes the responsibility is performed by subcontractors. In 1955 and all the years subsequent thereto the additions and improvements to all the apartments *110 such as equipment and appliances have been segregated in separate accounts for depreciation purposes and respondent has made no adjustment of the rate of depreciation claimed on these accounts. When petitioner constructed the apartments he intended to derive all the income which he expected to obtain therefrom within 20 years after completion of construction. In petitioner's opinion a neighborhood will deteriorate and the cost of operation will increase to such an extent after 20 years that continuing to operate the apartment thereafter is uneconomical. The time from the date of construction of each of petitioner's apartment buildings until the cost of operation thereof would equal the rental income or at least the rental income would not exceed the cost of operation by any more than a reasonable return on the original cost of the real property alone without improvements is as follows: 2144 NE 20th Avenue
30 years
3803-55 N. Lombard
25 to 30 years
2244 NW Overton
A little more than
30 years
4005-4069 N. Kerby
20 to 25 years
Beaverton
30 plus a few years
531-37, 609-15 NE Church
20 to 25 years
1510 NE 65th Avenue
A little more than
30 years An *111 average period for all the apartment buildings would be around 30 years. Petitioner on his income tax returns computed depreciation on a straight line method based on a useful life for each of the apartments constructed by him of 30 years and a useful life of 25 years from the date of its acquisition by him of the Fenwick Street Apartment. Respondent determined a useful life of 50 years for each of petitioner's apartments and computed petitioner's depreciation deduction accordingly on the straight line basis. Issue 2. Sales of Property a. Apartment During the years in issue petitioner owned and rented nine apartments which had been constructed by him over the years. The apartment at 1510 NE 65th Avenue was sold in July 1956, and the apartment at 531-37, 609-15 NE Church Street was sold in December 1956. The apartment at 8106-8114 N Fenwick, acquired by petitioner in a trade on October 31, 1954, was sold on June 22, 1955. The three apartments which petitioner sold had been rented by him from date of construction or acquisition until date of sale. The 65th Avenue apartment was constructed in 1952 with FHA financing. In connection with obtaining the FHA financing, petitioner *112 signed an FHA mortgagor's application form on which he stated that he intended to rent the building when construction was completed. The statement on the mortgagor's application form accurately expressed petitioner's intent with respect to the building at that time. Similar statements were made on FHA mortgage applications for two other apartments built by petitioner. The term of repayment for all three FHA mortgages, which were subsequently granted to petitioner, was 25 years. On an FHA mortgage application for a single-dwelling residence to be built by petitioner, petitioner stated that he intended to sell the property and specified a selling price. Petitioner never put a "For Sale" sign on the 65th Avenue apartment and did not list it with any broker or real estate agent for sale. The apartment was managed by Commerce Investment and petitioner did not give Commerce Investment any authority to sell the apartment. Petitioner sold the 65th Avenue apartment to a friend who had been considering buying an apartment and who approached petitioner with the idea of looking over some of petitioner's apartments. After looking at the 65th Avenue apartment, the friend called petitioner for *113 an appointment, and a month or so later a deal was worked out whereby petitioner sold the apartment to him. The apartment house on Church Street was sold by petitioner on the advice of Commerce Investment because a racial problem had developed there. Commerce Investment secured a buyer for the property. The property was sold at a loss. The apartment house on Fenwick Street was sold by petitioner at a loss. The sale, coming less than 8 months after its acquisition, was a result of petitioner's ascertaining that the building needed a complete set of new plumbing and wiring. Rather than make the necessary repairs, petitioner chose to sell. Prior to the years in issue, petitioner had built and subsequently sold or traded an apartment on N Interstate Avenue, the Insley Court apartments, the Carroll apartments, and the Nottingham Court apartments. The Carroll apartments were traded by petitioner for a farm called the "Ashiem" or "Peat Mountain Farm." Petitioner, in turn, traded the Ashiem farm for a farm owned by an individual named Bighaus and a contract receivable from Bighaus. The contract receivable from Bighaus was written off in 1957 as a bad debt in the amount of $552.59, incurred *114 in petitioner's trade or business. The Nottingham Court was trade by petitioner for the Fenwick apartment in 1954. It is well known among realtors that petitioner owns apartments in the Portland area and petitioner has been approached from time to time at least by one realtor who had a prospective buyer interested in one of petitioner's apartment properties. However, petitioner, in this situation usually would ask a price for the property which was too high to enable a prospective purchaser to get a fair return on what would be his capital investment. b. Cooke Property Petitioner acquired a 28-acre tract of land known as the "Cooke property" under a contract dated December 30, 1954. The contract provided that petitioner agreed to buy the property for $52,000 with $5,000 down and the balance in annual installments over a period of time. Petitioner became entitled to possession of the property on December 30, 1954, and was liable for all taxes, liens, and public charges accruing thereafter. The contract provided that petitioner shall have a survey of the tract made and shall subdivide and plot such property into not less than 60 lots, it being the intention of the petitioner *115 to construct individual houses on the lots plotted. Petitioner was further obligated to complete such subdivision by constructing the streets and public utilities at his expense. Petitioner bought the Cooke property with the intent of subdividing it and building residences on the lots for sale in his trade or business. Petitioner's plan for development of the Cooke property contemplated with respect to sewage disposal the use of septic tank and field tile sewer systems rather than a central permanent sewer system. While petitioner had been led to believe that he could use septic tank systems, the local county authorities objected and prohibited home building in that locality without permanent sewers. Under a septic tank system, a separate tank and field tile system is installed for each residence, whereas a permanent sewer system is one large plant with the necessary piping which collects and disposes of all sewage from the whole tract. Petitioner had an engineering report respecting the cost of installing a sewer system made which disclosed that the cost of a sewer plant alone would be $45,000. The expenditure of $45,000 for a sewer plant plus the additional expenses for installing *116 the pipe and other improvements that are a part of a complete sewer system was sufficient to deter petitioner from his original purpose of subdividing and building on the tract because the cost was more than petitioner felt he could afford at that time. By contract dated November 30, 1955, petitioner sold the tract of land to an individual named Edwards for $77,275. The contract with Edwards contained terms similar to the contract under which the petitioner purchased the property. Edwards bought the property with the intent of subdividing it into lots and constructing residences thereon for sale in his trade or business. Petitioner under the contract was obligated to dedicate to the city of Portland a certain roadway or street which provided an access to the property. The sale of the Cooke tract came about after a representative of Commerce Investment had approached petitioner several times stating that he had a prospective buyer (Edwards) for the tract and asked that petitioner consider selling. Finally petitioner authorized the representative of Commerce Investment to go ahead and find out how much he could get for the tract. Besides the fact that the additional cost of a complete *117 sewer system was more than petitioner felt he could afford, the fact that petitioner was not able to acquire a 14-acre tract adjoining the Cooke tract also led petitioner to sell the Cooke tract. Petitioner did have a rough map made by engineers to determine the way the tract could be subdivided. However, he took no steps other than this to develop the tract. The tract was not staked out, no roads were put in, and no other physical changes whatsoever were made in the tract prior to the sale thereof to Edwards. The road that petitioner was obligated to dedicate to the city of Portland had been built by him in conjunction with his building 12 or 14 houses on land adjacent to the Cooke tract. Petitioner on his books made a $4,800 charge to the Cooke tract for the road. c. Nevada Lot Petitioner in 1951 acquired a tract of land in his trade or business and plotted the tract into five lots. On four of the lots petitioner built residences, and sold the residences and lots in 1953. On one lot, hereinafter called the Nevada lot, petitioner did not build a residence. The Nevada lot was sold during the year 1956 for $1,400 and the expenses of the sale were $39.94. Petitioner was able *118 to employ septic tank and field tile system for the houses he built and sold on the tract. However, the local authorities would not permit a septic tank and field tile system to be used on the Nevada lot because of its low lying character. The local authorities had restricted building in that area until a bond issue could be floated for the installation of adequate sewers. At the time of the trial of this case sewers had been installed in the area of the Nevada lot and a house had been built on the lot. Petitioner's accountants in 1953 treated the Nevada lot as a scrap lot and its cost was written off to the cost of the four residences built on the other lots. Issue 3. Sale of Residence In 1954 petitioner built a single-unit residence at 3920 SW 96th Avenue in which he and his wife lived. Petitioner had owned the land on which the house was built for some 18 to 20 years prior to the construction of the house. During the 18 to 20-year period petitioner had several opportunities to sell the land at a gain but declined to do so because his idea had been to keep the land and eventually build his own home thereon. In 1956 petitioner sold the house at 3920 SW 96th Avenue to an *119 individual named Williams. Williams had been taken past petitioner's house one day by a real estate salesman. Later in the day the salesman called petitioner's home to ask if he could show the house. Petitioner's wife said that it would be all right. That night petitioner met with the salesman and Williams and agreed to sell his house under certain conditions. The conditions were that petitioner would have to put a price on the house and also retain possession of the house until he could build next door at 3950 SW 96th Avenue. The price set for the house was $32,500 which when reduced by $1,815.85 for selling expenses was less than the $32,460.21 actual cost of the house. As part of the arrangement with Williams petitioner completed a party room in the basement at a cost of $3,930.01. In accordance with the arrangement with Williams, petitioner retained possession of the old house at 3920 SW 96th Avenue until he finished construction of a new house on an adjoining lot at 3950 SW 96th Avenue. Upon the completion of the new house petitioner vacated the old house and moved into the new house. The cost of the new house was $22,660.59. One of the factors which motivated petitioner to *120 sell his old house was that there was not adequate space in the cellar for storage of various building tools and materials used in his trade or business, and there was no easy access to such storage space as was there. The materials had to be carried through the house and down the stairway to the cellar. In the new house at 3950 SW 96th Avenue petitioner made a garage entrance in the back of the basement so that he could drive around to the back of the house and into the basement and unload his materials. A good portion of the basement of petitioner's new house is used for the storage of paint, different types of plywood, cutoff saws, and handpowered saws. Petitioner has not claimed depreciation deductions with respect to any part of his new house. Petitioner had not listed the 3920 SW 96th Avenue residence with the salesman who showed Williams the house or with any other real estate agent or broker. The salesman who showed Williams the house did not know that the house was for sale but felt that it probably could be talked about. No "For Sale" sign was ever placed on the property. In 1954 petitioner sold a house at 3424 SE Harold Court in which he had lived up until the time he *121 built the house at 3920 SW 96th Avenue. The house at 3424 SE Harold Court was located on a tract on which petitioner was building residences for sale in his business. The two houses which petitioner occupied at 3920 and 3950 SW 96th Avenue were within a mile of where petitioner was building houses for sale in his trade or business. The house at 3424 SE Harold Court was sold for $26,500. The tax basis was $9,854.14 and the selling expenses were $306.63. Petitioner realized a gain of $16,339.23. Petitioner has occupied four houses in the last 14 years. Petitioner resided in the house at 3950 SW 96th Avenue at the time of the trial. Petitioner on his income tax return reported the gain on the sale of the apartment building at 1510 NE 65th Avenue, the Cooke tract, and the Nevada lot as a longterm capital gain. Respondent determined that the gain on the sale of each of these properties was ordinary income. Petitioner on his income tax return reported a total gain of $14,563.17 on the sale of his residence having used as a base the basis of a prior residence on the sale of which the gain had been deferred, and recognized a gain under section 1034 of the Internal Revenue Code *122 of 1954 of $8,023.56, the difference between the cost of the new residence and the net sale price of the old. He treated the amount of $8,023.56 as a longterm capital gain. Respondent determined that the gain of $14,563.17 constituted ordinary income to petitioner. Some of the facts have been stipulated and are found accordingly. Ultimate Findings of Fact The useful life in petitioner's trade or business of the nine apartments built by petitioner is 30 years. The useful life of the Fenwick Street apartment in petitioner's trade or business is 25 years from the date of its acquisition by petitioner. Petitioner was not holding the apartment building at 1510 NE 65th Avenue, the Cooke tract, the Nevada lot, or his residence at 3920 SW 96th Avenue for sale to customers in the ordinary course of his trade or business at the time of the sale thereof. Opinion Issue 1. Depreciation The first issue is the useful life for the purpose of computing depreciation of each of the apartment houses owned and rented by petitioner. Section 167 of the Internal Revenue Code *123 of 1954 provides for a depreciation deduction of a reasonable allowance for the exhaustion, wear, and tear (including a reasonable allowance for obsolescence) of property used in the trade or business of a taxpayer or property held for the production of income. One of the methods provided in that section for computing depreciation is the straight line method used by petitioner herein. The useful life of an asset is to be related to the period for which it may reasonably be expected to be employed in a taxpayer's business not to the full abstract economic life of the asset in any business. Massey Motors v. United States [60-2 USTC [*] 9554], 364 U.S. 92 (1960). We have found as an ultimate fact that the useful life of each of the apartments constructed by petitioner is 30 years and that the useful life of the Fenwick apartment is 25 years from the date of petitioner's acquisition thereof. Petitioner testified that when he constructed an apartment house it was his idea that he would derive all the income from the apartment that he was going to get in the first 20 years. *124 He stated that usually in Portland a neighborhood of the type in which he built will deteriorate sufficiently after 20 years that rental income from an apartment after considering the increased cost of maintenance as the apartment gets older is unlikely to yield a net profit. However, the testimony of petitioner's expert witness who was experienced generally in the management and operation of apartments in the Portland area and had been active in the management of seven of petitioner's apartments was that if the seven apartments belonging to petitioner with which he was familiar, 30 years from the date of construction would represent their average economically useful life. By economically useful life the witness meant the duration of time after which the rental income would not exceed the cost of operation by more than a fair return on the original cost of the real property without improvements. The witness' testimony reasonably defines what the economically useful life of an apartment building would be for the purpose of computing depreciation. Once the rental income from the apartment is not sufficient to yield a return on the building itself but only to cover the costs of operation *125 and a fair return on the cost of the land, then, assuming there are other advantageous uses for the land itself, there would be little, if any, incentive in continuing the apartment building. Under such circumstances the investment in the building itself should have been recovered by that time. Petitioner generally obtained 25-year mortgages on his apartment buildings. The evidence also shows that when there was a neighborhood change in the area in which one of petitioner's apartments was located he sold the apartment when it was slightly less than 5 years old. Considering all the evidence we hold that the useful life in petitioner's trade or business of the apartments constructed by him is 30 years and that of the Fenwick apartment is 25 years from the date petitioner acquired it. Issue 2. Sales of Property a. Apartment Section 1221 of the Internal Revenue Code of 1954 defines a capital asset as property held by a taxpayer with the exceptions therein specified. One of the exceptions is property, used in a trade or business, of a character subject to the allowance *126 for depreciation and real property used in a taxpayer's trade or business. It is clear from the facts in the instant case that petitioner was in the trade or business of renting apartments and therefore his apartments would not be capital assets within the meaning of section 1221 of the Internal Revenue Code of 1954. Section 1231 of the Internal Revenue Code of 1954[1] provides that under the circumstances therein specified, the gains from the sale of property used in the trade or business shall be considered as longterm capital gains. However, property used in the trade or business of a taxpayer as defined in section 1231 of the Internal Revenue Code of 1954 does not include property held by a taxpayer primarily for sale to customers in the ordinary course of his trade or business. The question for decision here is thus narrowed to whether the apartment on 65th Avenue sold by petitioner in 1956 was property held by petitioner primarily for sale to customers in the ordinary course of his trade or business. *127 Whether the apartment was held primarily for sale in the ordinary course of petitioner's business is a question of fact. Raymond Bauschard, 31 T.C. 910, affd. 279 F. 2d 115 (C.A. 6, 1960); Solly K. Frankenstein, 31 T.C. 431 (1958), affd. 272 F. 2d 135 (C.A. 7, 1959), certiorari denied 362 U.S. 918 (1960). In determining this fact many tests have been used by the courts, among which are the following: (1) The purpose for which the property was acquired, (2) the frequency and continuity of sales over a period of time, (3) the nature of the taxpayer's business, and (4) the activity of the seller about the property with respect to the improvement of the property and the promotion of sales. No one fact is determinative. Raymond Bauschard, supra, and Solly K. Frankenstein, supra. It is well established that a dealer in real estate may occupy a dual role, i.e., he may be a dealer with reference to some of his properties and an investor as to others. Eline Realty Co., 35 T.C. 1 (1960); *128 Charles E. Mieg, 32 T.C. 1314 (1959); D. L. Phillips, 24 T.C. 435 (1955); and Walter R. Crabtree, 20 T.C. 841 (1953). There is no question that petitioner is in the business of building and selling single-unit residences and his income therefrom has been reported as ordinary income. The fact does not prevent petitioner from being in the business of renting apartments and prevent his apartments from being property which was not held primarily for sale to customers in the ordinary course of his trade or business. Based on all the evidence of record, we have found as an ultimate fact that the apartment house was not held by petitioner primarily for sale to customers in the ordinary course of his trade or business. The 65th Avenue apartment, as well as at least two other of petitioner's apartments, was constructed with FHA financing. On the FHA mortgagor's application forms relating to the three apartments for which loans were secured, petitioner stated that he intended to rent the respective building when construction was completed. This is in contrast to a loan application for a single-unit dwelling on which petitioner stated that his intention *129 was to sell the house upon completion of construction and named the selling price. Petitioner's statement relative to his renting the apartment house when completed accurately portrayed his true state of mind at the time. Furthermore, the 65th Avenue apartment was rented upon completion and held as rental property for over 4 years before it was sold. In addition, petitioner rents all the apartment buildings which he owns, and, as set out in our findings, derives substantial income therefrom. Respondent argues that it is necessary for one dealing in apartments to hold the apartment he plans to sell for a period in order to have a record of income for a prospective buyer to estimate his return on the ensuing investment. It might perhaps be wise for a seller of apartment houses to have an earnings record to show a prospective buyer, or, at least, it might be wise for the seller to have the apartment fully rented when he sells so that he, in effect, would be selling a going enterprise rather than just a bare building. Nevertheless, this would not explain the holding of the building as rental property for a period of over 4 years, particularly when considered in the light of the other *130 apartments being rented by petitioner and the length of time for which they had been held and rented by him. It is clear that petitioner was holding the building as an investment or rental property. Cf. Nelson A. Farry, 13 T.C. 8 (1949). The circumstances under which the building was sold also negate respondent's contention that the property was held primarily for sale to customers in the ordinary course of petitioner's trade or business. A friend of petitioner's approached him one day stating that he had been in the market looking for an apartment and would like to see petitioner's apartments. Petitioner gave the friend the names of two of his apartments. After looking over the 65th Avenue apartment, the friend called petitioner and about a month later the two worked out a deal whereby the apartment was sold. With respect to the sale of the 65th Avenue apartment, petitioner did no soliciting on his own and did not give a listing to any realtor. Petitioner played only a passive role in the sale of the apartment. Cf. Frieda E. J. Farley, 7 T.C. 198 (1946). Respondent points to the fact that petitioner has a history of buying and selling rental properties *131 which is sufficient to place petitioner in the trade or business of selling apartments. Respondent points to seven other sales or exchanges of properties over a 12-year period. One of the transactions involved the exchange of farms and not apartment buildings. One transaction involved an apartment which respondent asserts was built on N Interstate Avenue in 1943 and sold in 1945 but the record shows none of the facts with respect to this transaction except that it was a number of years before those here involved. The five remaining transactions which involve apartment buildings represent the sum of petitioner's dealing in this area over a 10-year period. We do not think this is sufficient activity to place petitioner in the trade or business of selling apartment buildings, particularly when the circumstances surrounding some of these transactions are considered. The Church Street apartment was sold in 1956 as a result of the development of a racial problem. Commerce Investment suggested to petitioner that he dispose of the building. Commerce Investment got a buyer for the apartment and it was sold at a loss. The Fenwick Street apartment was also sold in 1955 after it developed that *132 petitioner either had to sell it or put a complete set of new plumbing and new wiring therein. This apartment was sold at a loss. The record shows that petitioner has been approached from time to time by at least one real estate salesman trying to interest him in selling one of his apartments, but that petitioner in this situation asks an unrealistically high price for the property. This also indicates that petitioner is not holding his apartments primarily for sale to customers in the ordinary course of his business. The cases cited by respondent in support of his position, Rollingwood Corp v. Commissioner, 190 F. 2d 263 (C.A. 9, 1951), affirming a Memorandum Opinion of this Court and Pool v. Commissioner, 251 F. 2d 233 (C.A. 9, 1957), affirming a Memorandum Opinion of this Court, certiorari denied 356 U.S. 938, are distinguishable on their facts from the instant case. In the Rollingwood case the taxpayer had been in the business of building and selling houses. During wartime in order to build, petitioner was obligated to initially rent the houses with 30-month options to the lessees to buy. Within 4 years after the 700 houses had been built *133 all but 4 of the houses were sold. In the Pool case, 170 duplexes were built under war priorities which required that the units be rented. In 1945 the ceiling sales price on all war priority housing was lifted but not OPA controls over rental. Starting with June 1946 through July 1947, 168 of the duplexes were sold. In conjunction with the sales there was an aggressive and active sales campaign. The facts which led to the conclusion that the taxpayers in the Rollingwood Corp. and Pool cases were holding the property there involved primarily for sale to customers in the ordinary course of their trade or business are not present in the instant case. b. Cooke Property The gain on the sale of the Cooke property was reported by petitioner on the installment basis. The respondent has determined that the amount of gain realized for each of the taxable years here involved, $2,636.75, $2,636.75, $2,292.03, and $3,542.58 for the years 1955, 1956, 1957, and 1958, respectively, is recognizable in full. Petitioner contends that at the time of sale the Cooke property was not held primarily for sale to customers in the ordinary course of his trade or business and thus the gain on the sale *134 of this property should be considered as long-term capital gain. The issue here, as with the sale of the 65th Avenue apartment, supra, is a question of fact and all the relevant factors mentioned with respect to the 65th Avenue apartment are equally applicable to this issue. Petitioner acquired the 28-acre Cooke property under a contract dated December 30, 1954, for a price of $52,000. Under the contract petitioner was obligated to subdivide the tract into at least 60 lots with a view toward building individual houses thereon to be sold to customers in petitioner's trade or business. Petitioner had been led to believe that he could use septic tank and field tile systems for the houses to be built on the tract. However, the local county authorities rejected petitioner's proposed plan for using septic tank and field tile systems, stating that no more houses could be built in the area without permanent sewers. Petitioner had an engineering report made to determine the cost of a sewer system. The cost determined was $45,000 which was more than petitioner was willing to pay. At this juncture petitioner abandoned his intent, at least temporarily, of subdividing the tract and building *135 houses thereon. Sometime thereafter, a representative of Commerce Investment suggested to petitioner that he sell the Cooke tract, stating that he, the representative, had a prospective purchaser for the tract. Petitioner put him off by saying he would think it over. After being approached by the representative three or four times on the subject, petitioner finally told him to ascertain the price he could obtain for the property. On November 30, 1955, the Cooke tract was sold to an individual named Edwards for $77,275 on substantially the same terms as petitioner had purchased the property. While petitioner held the Cooke tract it was not staked out and subdivided and was subdivided on paper only by a rough sketch made by engineers who were determining the cost of installing a permanent sewer system. Petitioner built no roads on the tract. We conclude upon all the facts that petitioner was not holding the Cooke tract primarily for sale to customers in the ordinary course of his trade or business. Respondent relies primarily on James E. Kesicki, 34 T.C. 675 (1960), in support of his position. In that case the taxpayer, a building contractor, was in the business *136 of purchasing vacant properties, erecting buildings thereon, and selling them to customers pursuant to respective agreements with them. The taxpayer entered into an agreement with a doctor to acquire a particular parcel of land, to build thereon a building for doctors' offices, and sell the completed package to the doctor for a stipulated price. Taxpayer acquired the land, obtained a building permit, had an architect draw up plans for construction and proceeded with some work in digging trenches for foundations. However, the deal fell through because of the inability of the doctor to finance the purchase. Taxpayer placed a sign on the lot stating that he would "build to suit." The Court held that the taxpayer was at the time of sale holding the property for sale to customers in the ordinary course of his trade or business. The Kesicki case is distinguishable from our present case. Kesicki was in the business of building to suit a customer and then selling the completed package to the customer. When his original arrangement with the doctor fell through he still held the land out with the offer to build to suit. This was holding the property for sale to customers in the ordinary course *137 of his trade or business. It does not matter that the land was sold by itself without his having built on it. In the present case petitioner was in the business of subdividing, building houses thereon and selling the houses and individual lots as completed packages to customers. With respect to the Cooke tract, however, petitioner abandoned this purpose and subsequently sold the tract as unimproved property. Petitioner was holding the Cooke property primarily for the purpose of subdividing it and building thereon and not primarily for sale to customers in the ordinary course of his trade or business. c. Nevada Lot The issue is whether petitioner held the Nevada lot primarily for sale to customers in the ordinary course of his trade or business. Respondent determined that petitioner's $1,360.06 gain arising from the sale by petitioner of the Nevada lot was ordinary income. Petitioner in 1951 acquired a tract of land in his trade or business and plotted the tract into five lots. On four of the lots he built residences and sold the residences and the underlying lots in 1953. With respect to the residences petitioner built on the tract he was able to use septic tank and field *138 tile systems. On the fifth lot, the Nevada lot, the local authorities would not permit the use of a septic tank and field tile system because of the low lying character of the lot. In fact, building in this area was restricted until an adequate sewer system could be installed. This being the case, petitioner's accountants in 1953 treated the Nevada lot as a scrap lot and wrote off its cost against the four residences that were built and sold. In 1956, the lot was sold. At the time of the trial of this case, a sewer system had been installed and a house had been built on the lot. The factual issue here is somewhat similar to that involved in connection with the Cooke tract, although the facts here present a more borderline situation. It is clear, however, that petitioner could not build on the lot until a sewer system had been installed in the area. It is true that if a sewer system had been put in while petitioner held the lot he could have gone ahead and built on the lot. However, he did not build on it and while he was holding it awaiting building thereon, he sold it. He had at least temporarily abandoned the original purpose for which he acquired the lot. On the basis of all the *139 facts, we hold that at the time of the sale petitioner was not holding the property primarily for sale to customers in the ordinary course of his trade or business. Cf. Eline Realty Co., supra.
Issue 3. Sale of Residence The issues here are (1) whether petitioner held his old residence primarily for sale to customers in the ordinary course of his trade or business so that any gain arising therefrom would be treated as regular income and (2) if not, whether the fact that petitioner uses part of his new residence for storing materials and tools used in his trade or business would require an allocation of the cost of the new residence to be made between business and personal use in determining the extent of the nonrecognition of gain upon the sale of the old residence under the provisions of section 1034 of the Internal Revenue Code of 1954. Should it be decided under the first issue that petitioner's old residence was held primarily for sale to customers in the ordinary course of his trade or business, a further question would be whether section 1034 would be applicable at all in deferring part of any realized gain, and if section 1034 is *140 not applicable, whether petitioner can use as a basis for the old residence the actual cost of the old residence rather than the substituted basis resulting from the deferral of recognition of gain on the sale of a previous residence. Under the second issue, should it be decided that section 1034 would be applicable and should it be decided that an allocation of the cost of the new residence between business and personal use must be made, there would be the further issues of (1) whether there is sufficient evidence in the record upon which an allocation properly can be made and, if so, (2) a determination of the proper allocation. Respondent argues that petitioner at the time he sold his old residence was holding it primarily for sale to customers in the ordinary course of his trade or business and, therefore, any gain would be treated as ordinary income. Respondent further contends that section 1034 of the Internal Revenue Code of 1954 cannot be applied to defer recognition of any of the gain realized upon the sale of petitioner's old residence since the new residence is used in part for business purposes; and there being no basis in the record for an allocation *141 between business and personal use of the new residence, the respondent's determination, recognizing the entire gain based on the substituted basis, must be upheld for failure of proof on the part of petitioner. The first issue, whether petitioner at the time he sold his old residence was holding it primarily for sale to customers in the ordinary course of his trade or business, is, of course, factual. In 1954 petitioner built a residence at 3920 SW 96th Avenue in which he and his wife lived. Petitioner had owned the land on which this house was built for 18 or 20 years. During this period petitioner had several opportunities to sell the land at a profit, but declined the offers because it was always his plan to some day build his home on the property. The sale of the house came about when a real estate salesman, acting on his own initiative, drove a prospective house buyer, Williams, past petitioner's house. That same day the salesman called petitioner's house to ask if he could show the house to Williams. Petitioner's wife gave the salesman permission to show the house. That evening petitioner met with Williams and the salesman at his house and he agreed to sell his house subject *142 to the conditions that he set a price for the house and that he be permitted to retain possession of the house until he built a house next door on an adjoining lot. These terms were subsequently agreed to and the arrangement was carried out accordingly. The price that petitioner set for the house was $32,500, which when reduced by the selling expenses, was less than the actual cost of the house. One of the factors which motivated petitioner to sell his house was that he did not have adequate storage space in his cellar for keeping various materials and tools used in his trade or business and for what space he did have the only access was through the house and down the cellar stairs. The salesman who showed Williams petitioner's house testified that he could not say that he knew petitioner's house was for sale but that he thought "it probably could be talked about." When asked why he happened to drive by petitioner's house in the first place, the salesman stated that although he could not recall specifically the reason for this, he felt that he had not made a particular point of taking Williams by petitioner's house but probably that he was driving around in the neighborhood showing *143 Williams another house. We hold on the entire record that at the time of sale petitioner was not holding his residence primarily for sale to customers in the ordinary course of his trade or business. Petitioner had held the land some 18 to 20 years before he built, always with the hope of having his home there and his role in the sale of the house was passive. The facts that no price was set on the house when the prospective buyer expressed an interest in buying it and petitioner put as a condition on its sale that he be permitted to live there until he completed a house next door, further indicate that petitioner was not holding the house primarily for sale to customers in the ordinary course of his trade or business. The sales price set by petitioner, although set at what he felt would cover the cost of the old residence, was actually too low and an actual loss resulted from the sale. The record negates respondent's contention that petitioner had a consistent pattern of selling his personal residences. The record shows that petitioner has had only four residences in the last 14 years. At the time of trial petitioner was still residing at 3950 SW 96th Avenue where he moved when *144 he sold his 3920 SW 96th Avenue house. The other main issue with respect to the sale of petitioner's residence is the applicability of section 1034 of the Internal Revenue Code of 1954 in deferring recognition of part of the gain realized upon the sale of the residence. That section of the Code provides generally that gain realized upon the sale of a residence will be recognized only to the extent the adjusted sales price of the residence exceeds the cost of purchasing a new residence. The purpose of section 1034 was to grant tax relief to home owners, who for one reason or another sold their home at a gain and used the proceeds to purchase a new home. Section 1.1034-(c)(3)(ii), Income Tax Regs., provided as follows: Where part of a property is used by the taxpayer as his principal residence and part is used for other purposes, an allocation must be made to determine the application of this section. * * * If the new residence is used only partially for residential purposes only so much of its cost as is allocable to the residential portion may be counted as *145 the cost of purchasing the new residence. This regulation is a reasonable interpretation of section 1034. It is clear that Congress meant to confer tax deferment privileges only with respect to personal residences and not to business property. In the committee reports the following is stated: Where the taxpayer's residence is part of a property also used for business purposes, as is the case of an apartment over a store building or a home on a farm, and the entire property is sold, the provisions of section 303 will apply only to that part of the property used as a residence, including the environs and outbuildings relating to the dwelling but not to those relating to the business operations. H. Rept. No. 586, 82d Cong., 1st Sess., p. 27 (1951), 1951-2 C.B. 378. The facts of the present case show that petitioner built his new residence so that he could drive around in back of the house and into the basement and unload his building tools and materials, i.e., paint, different types of plywood, cutoff saws, and handpowered saws, and that a good portion of petitioner's basement is loaded with this type material. Petitioner has not claimed any depreciation on the use *146 of his basement. The issue is whether the petitioner's use of his basement was the sort of business use Congress intended to exclude from the benefits of section 1034. We do not think that petitioner's use was the sort of business use which Congress intended to exclude from the benefits of section 1034. The specifying of an apartment over a store or a house on a farm as the type of situation where an allocation between business and nonbusiness use would have to be made indicates the intention of an allocation where an active business use was made of part of the property and a use more substantial than the storing of building tools and materials in a part of the basement. It is relatively common for assets used in a person's trade or business, e.g., an automobile, books, etc., to be stored in or on a person's personal premises, either permanently or temporarily, and this situation is distinguishable from that in which the trade or business itself is actually being carried on, on the personal premises as is the situation in the examples given in the committee reports. When only a portion of the basement of a house is used for storage of tools or supplies used in a taxpayer's trade *147 or business, such usage of the house is too insignificant to require an allocation of a portion of the cost thereof to business usage. Since we have decided that petitioner's personal residence was not held primarily for sale to customers in the ordinary course of his trade or business and that no allocation of the new residence between business and nonbusiness usage is required, the alternative issues become moot. Issue 4. Charitable Deduction In his petition, petitioner alleged error in the respondent's disallowance of certain claimed charitable contributions. Petitioner introduced no evidence with respect to this point at the trial. This issue must be resolved in favor of respondent for failure of proof on the part of petitioner. Decision will be entered under Rule 50. Footnotes
1. SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS. (a) General Rule. - If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months * * * (b) Definition of Property Used in the Trade or Business. - For purposes of this section - (1) General rule. - The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not - * * *
(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or↩