W. E. Anderson and Helen C. Anderson v. Commissioner.
Anderson v. Commissioner
Docket No. 93636.
United States Tax Court
T.C. Memo 1964-193; 1964 Tax Ct. Memo LEXIS 144; 23 T.C.M. (CCH) 1170; T.C.M. (RIA) 64193; July 15, 1964
*144 Richard F. Alden, for the petitioners. Edward M. Fox, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following deficiencies in the income taxes of petitioners: Year
Deficiency
1956
$ 628.51
1957
285.72
1958
13,323.03
In their petition the petitioners claim an overpayment in the amount of $1,433.52 for the taxable year 1957. In aserting his deficiencies the respondent made several adjustments to petitioners' reported income and deductions for taxable years 1956, 1957, and 1958. Although error was assigned in the petition to many of these adjustments, petitioners conceded all but one issue at the trial of this case. The remaining issue for decision is whether gain realized by petitioners from the sale of parcels of real property during the years in question is taxable as ordinary income or capital gain. Findings of Fact Some of the facts were stipulated by the parties. The stipulation of facts and exhibits attached thereto are incorporated herein and made a part of our findings. W. E. Anderson and Helen C. Anderson are husband and wife, who reside at 717 Santana Drive, Corona *145 del Mar, California. They filed their joint Federal income tax returns for the years 1956, 1957, and 1958 with the district director of internal revenue at Los Angeles, California. They used a calendar year and cash basis of accounting for reporting their income during such years. On February 17, 1953, Robert L. Smith (hereinafter called Smith) entered into an agreement with Claresta Gerry Wiedemann (hereinafter called Wiedemann) for the purchase of 35.04 acres of land located on the outskirts of the City of Ventura in Ventura County, California. Under the terms of the agreement Smith agreed to pay Wiedemann the sum of $166,250 or approximately $4,744.58 per acre. Twenty thousand dollars of the purchase price was paid upon the execution of the agreement. The balance of $146,250 was payable in installments of $20,000 or more on or before the 15th day of January of each calendar year thereafter, the first such installment begin payable on or before February 15, 1964. However, the Wiedemann agreement provided that more than one such installment could be paid in any one year. The agreement further provided that Smith was entitled to receive a grant deed to, and possession of, any portion *146 of the 35.04 acres designated by him upon the payment of installments on the principal balance of the purchase price at the rate of one acre for each $4,750 of principal included in such payment. Smith was also granted an option to purchase an additional 23.19 acres of land located directly west of, and continguous to, the 35.04 acres. The option was exercisable within 4 years from February 17, 1953. The purchase price for the 23.10 acres of land was $139,000 or approximately $5,966.65 per acre, payable $30,000 upon the execution and delivery to Smith of a deed for the 23.19 acres and $30,000 plus interest each year thereafter until the unpaid principal balance was paid in full. Prior to becoming entitled to possession of the 35.04 acres an the 23.19 acres of land, or any portion thereof, Smith, his agents or representatives, had the right under the terms of the Wiedemann agreement to enter upon the land for the purpose of making surveys, inspections, soil tests, and similar purposes at any time, so long as they did not unreasonably interfere with farming operations being carried on by Wiedemann or her tenants. The Wiedemann agreement also included the following provisions: *147 1. Wiedemann agreed that, in the event Smith desired to subdivide all or any portion of the 35.04 acres of land, she would upon Smith's request sign any subdivision map or maps requiring her signature and that she would execute such documents as might be required by the Federal Housing Administration to assure that she would not cause or permit anything to be done on any portion of the 35.04 acres or the 23.19 acres adjacent thereto which would depreciate the value for residential purposes of the 35.04 acres. 2. Wiedemann agreed that, if at any time Smith desired to obtain sewer service from the City of San Buenaventura (Ventura) for the benefit of the real property or any part thereof, she would deed and convey to Smith or to the City of San Buenaventura, if Smith so designated, an easement and right-of-way for the installation, use, and maintenance of a sewer main across the 35.04 acres and the 23.19 acres. 3. It was contemplated that Smith might install streets, curbs, and sidewalks from time to time upon those portions of the 35.04 acres to which he acquired title. 4. The parties expressly agreed that, as to any portion of the real property which had from time to time been *148 deeded by Wiedemann to Smith in accordance with the agreement, any subsequent default by Smith in performance of the terms, covenants or conditions of the agreement would not in any manner affect his title thereto or rights therein. As to any portion of the real property which had not been so deeded by Wiedemann to Smith, it was agreed that time was of the essence of the agreement and each and every term, condition, and provision thereof, and in the event of a breach of any one or more thereof, in addition to any other or different remedy available to Wiedemann, seh could declare Smith's rights under the agreement terminated and could retain his $20,000 payment made at the time of the execution of the agreement and any interest payments made by Smith as liquidated damages and as consideration for the option therein contained. The real property coevred by the Wiedemann agreement was used for agricultural purposes, primarily the cultivation of walnut and lemon groves. From 1940 to 1953 W. E. Anderson (hereinafter called petitioner) was engaged in the wholesale fruit and vegetable business in Topeka, Kansas: as president of the W. O. Anderson Commission Company from 1940 to 1944; *149 as a partner in Anderson Brothers from 1944 to 1952; and as manager of Pacific Gamble Robinson Company from 1952 to 1953. In April 1953 the petitioner became interested in moving to California and engaging in the business of owning and operating a lemon grove. He traveled to Ventura County, California, for the purpose of locating a lemon grove to purchase. He contacted the Sunkist citrus packing organization and several real estate brokers in an effort to acquire a lemon grove. Although the petitioner was interested in acquiring a lemon grove owned by a man named Edwards, no agreement was reached and he returned to Kansas at the end of May 1953. Petitioner returned to California in July or August 1953 for the purpose of attempting to purchase Edwards' property. However, he discovered this property could not be obtained. During this trip he met a real estate broker named Woodruff and his salesman named Ferguson. These men discussed with petitioner the possibility of acquiring property for the purpose of development rather than farming. They located a woman who agreed to sell petitioner some real property for said purpose. Petitioner contacted the women's attorney, Al Barnes, to *150 have a sales contract drafted. Shortly thereafter, however, Barnes notified petitioner that his client was no longer willing to sell her property. But Barnes advised petitioner of another client, Smith, who might be willing to sell land to him. Barnes later arranged for Smith to meet petitioner in Topeka. At the meeting Smith and petitioner reached a tentative agreement for petitioner to purchase from Smith a one-half interest in the Wiedemann agreement. On October 5, 1953, petitioner and Smith met in Barnes' office in Ventura and executed a formal agreement whereby Smith assigned to petitioner a one-half interest in the Wiedemann agreement for $10,750. Between October 5, 1953, and early January 1954, Smith and petitioner had discussions with Jack Borrell, a Ventura real estate broker, relative to subdivision and sale of the real property covered by the Wiedemann agreement. In January 1954 petitioner requested Borrell to investigate the procedures to be followed to subdivide and develop the property for sale. On October 5, 1953, Smith and petitioner paid to Wiedemann approximately $60,000 in exchange for which they selected about 13 acres of land. Since Smith did not have sufficient *151 funds to advance his one-half of the payment, petitioner provided the entire funds. Smith gave petitioner his promissory demand note for $30,000 which, it was understood, would be paid in January 1954. In lieu of interest on said note, petitioner agreed to accept the proceeds from the sale of lemons which were growing on the 13 acres. Upon petitioner's return to California from Kansas in January 1954, Smith and petitioner agreed to attempt to sell the real property covered by the Wiedemann agreement for $8,500 per acre. They talked to various real estate brokers and advised them that the property was for sale. Petitioner also talked to numerous contractors in an effort to interest them in acquiring the land. In January 1954 Jack Borrell introduced petitioner to Walter Shultz, a contractor who was interested in acquiring the real property. However, Shultz was interested in purchasing the land for a price only slightly in excess of the amount which Smith and petitioner would have to pay under the Wiedemann agreement. Petitioner was not interested in such a deal. Shultz eventually proposed purchasing the property for a price based on the cost thereof to Smith and petitioner plus a *152 percentage of any profit he might make from subdividing the property and building residences for sale. Smith originally declined to accept this proposal. Ultimately, however, he authorized petitioner to make such a deal with Shultz but, by that time, Shultz had committed himself to acquiring another piece of property and, consequently, declined to go through with the transaction. Subsequently, petitioner met George Brown. He discussed with Brown the possibility of Brown's firm purchasing the property. Brown referred him to his partner Walter Keusder, Sr. In late February or early March 1954 petitioner contacted Walter Keusder, Sr., a partner of Davies, Keusder and Brown (hereinafter called DK&B), relative to the property covered by the Wiedemann agreement. DK&B is a partnership engaged in the general contracting business. Keusder was interested in acquiring lots upon which to build residences for sale, but his firm was without sufficient funds with which to purchase the land, subdivide it, and provide off-site improvements. Keusder proposed to petitioner that DK&B would manage the subdivision, improvement, construction of residences, and sale thereof for Smith and petitioner *153 in return for 50 percent of the profits derived therefrom. This proposal was rejected. No agreement was reached between Smith and petitioner and DK&B following the initial discussions with Keusder. However, Keusder took steps to determine the suitability of the land for subdivision, to ascertain if rezoning approval could be obtained from the Ventura County Planning Commission, and to investigate the avaliability of FHA financing for the construction of residences. In March 1954 DK&B engaged the engineering firm of Milton E. Ramelli to survey, conduct soil tests, and prepare a tentative subdivision map of the property covered by the Wiedemann agreement. In late April or early May 1954 DK&B secured from the FHA an informal approval of the suitability of the property covered by the Wiedeman agreement for financing. The tentative subdivision map prepared by Ramelli and Martin was submitted by that firm to the Ventura County Planning Commission on June 9, 1954. This map was conditionally approved by the Commission on July 12, 1954. On July 20, 1954, Smith and petitioner executed a written agreement (hereinafter called the DKB agreement) with Marshal M. Davies, Walter W. Keusder, *154 and George P. Brown, members of DK&B, relative to the property covered by the Wiedemann agreement, including all but 7 acres of the property covered by the option. The 7 acres not included in the DKB agreement were designated as "suggested church site" and "proposed commercial" on the map. The DKB agreement provided, in part, as follows: THIS AGREEMENT, made and entered into this… day of July 20th, 1954, between ROBERT L. SMITH and W. E. ANDERSON, herein called "Owners", and MARSHAL M. DAVIES, WALTER W. KEUSDER, and GEORGE P. BROWN, herein called "Buyers", WITNESSETH: WHEREAS, Owners are the owners of real property in the County of Ventura, State of California, more particularly described in Exhibit "A" attached hereto and made a part hereof; and WHEREAS, Buyers are desirous of acquiring lots for the purpose of building houses for speculative sale; and WHEREAS, said real property is presently unimproved and must be subdivided into building lots before it is of any value to Buyers; and WHEREAS, Buyers are without funds to defray the cost of subdividing said property and require that Owners subdivide it; and WHEREAS, Buyers are not willing to agree to pay Owners for said *155 lots on any basis other than actual cost to said owners plus an amount which is dependent upon the success of Buyers' operations; and WHEREAS, Buyers are members of a partnership which is licensed as a General Contractor under the laws of the State of California, and doing business under the name of "Davies, Keusder & Brown", herein called "Contractor". NOW, THEREFORE, the parties hereto agree as follows: 1. Owners will at their expense subdivide the real property described in the attached Exhibit "A" in parcels and at the times hereinafter set forth. The layout and the improvements, consisting of streets and necessary utilities, will be in accordance with requirements of and approved by the Federal Housing Administration and such local governing bodies as have jurisdiction over said property, for use in the construction of single family residences. Buyers, either individually or through Contractor, will without cost to Owners (except as otherwise provided in paragraph 10 hereof) supervise the designing, engineering and installation of the subdivision improvements. Said supervision will include obtaining necessary permits and approvals and seeing that maps and other documents *156 are properly recorded. It is intended initially to prepare a tentative subdivision map of the entire property, but to record only a subdivision map of approximately forty lots. 2. Upon recordation of the first subdivision map Owners will convey to Buyers, or to Contractor if Buyers so desire, four lots to be selected by Buyers from said first subdivision, which lots Buyers hereby agree to purchase upon the terms and conditions hereinafter set forth. Buyers will construct on each of said lots a model house. 3. In consideration of the purchase by Buyers of four lots as set forth in paragraph 2 hereof, Owners hereby grant to Buyers the following exclusive options, exercisable by giving written notice to Owners: (a) To purchase the remaining lots in said first subdivision on or before nine months from the date of recordation of the first subdivision map referred to in paragraph 1 hereof. (b) Provided the option set forth in the foregoing sub-paragraph (a) shall have been exercised, to purchase a minimum of thirty lots from subsequent subdivisions of said property on or before one year from the expiration of said ninemonth period. (c) To purchase a minimum of thirty lots on or *157 before the expiration of each succeeding one-year period until all lots have been purchased. Provided, however, that the options granted by the foregoing sub-paragraphs (b) and (c) may not be exercised by Buyers until such time as Owners have received payment in full for the purchase price of at least seventy-five per cent of the lots previously purchased by Buyers. 4. Upon the proper exercise by Buyers of an option granted by sub-paragraphs (b) and (c) of paragraph 3 hereof, Owners will proceed with the subdivision of an additional portion of the property sufficient to provide the number of lots specified by Buyers in their notice. Said subdivision work will be done at Owner's expense under the supervision of Buyers in like manner as set forth in paragraph 1 hereof. 5. The price to be paid to Owners by Buyers for each lot purchased hereunder shall be the sum of the following amounts: (a) Owners' cost of the land. Said cost is agreed to be based upon $5,000.00 per acre for approximately thirty-five acres and $6,000.00 per acre for approximately twenty acres, divided by the number of lots into which each priced acreage is to be subdivided. In this connection, areas lost because *158 of barrancas and the area reserved for state highway purposes will not be subtracted from the total acreage in determining the amount to be divided by the number of lots. (b) Owners' cost of subdivision improvements, including engineering fees, permits and inspection fees, allocated equally over the lots in each successive subdivision. (c) An amount equal to fifty per cent of the net profit (computed as hereinafter provided) realized by Buyers, individually or through Contractor, upon the sale of the house and lot. 6. For the purpose of determining Buyers; or Contractor's profit upon the sale of houses and lots, only the following items will be deducted as costs and expenses: (a) Land and subdivision costs computed as set forth in sub-paragraphs (a) and (b) of paragraph 5 hereof. (b) Actual cost of house construction, including architects' fees, insurance, equipment rental, and on-the-site clerical and supervisory services. (c) Actual cost of selling the houses, including advertising, sales salaries or commissions, escrow, recording, and title expenses, and taxes and other prorations adjusted through escrow. (d) Financing costs, including commitment fees, appraisal fees, *159 and interest on construction and other loans payable up to the actual date of sale. Any construction money supplied by Buyers shall be deemd loaned at an interest rate of six per cent per annum. (e) Fees of attorneys, accountants, and other professional advisors necessarily incurred in connection with the subdivision, construction, financing or sale, but not in connection with the preparation and execution of this agreement. No part of the general office overhead of Buyers or Contractor and no compensation to the Buyers individually or as partners in Contractor shall be included in the foregoing costs and expenses. 7. The purchase price of each lot, computed as hereinabove provided, shall be payable upon the sale by Buyers or Contractor of said lot and the house constructed thereon. Each remittance by Buyers to Owners shall be accompanied by a statement showing the computation of the amount. 8. All conveyances made by Owners hereunder shall transfer title to Buyers or their nominee, free and clear of liens and encumbrances, with taxes to be prorated as of date of conveyance, reserving to Owners, however, subsurface mineral rights only. 9. If Buyers fail to commence construction *160 of a house on any lot purchased from Owners pursuant to this agreement within one year from the date of transfer of title to said lot from Owners to Buyers, then Buyers may, and upon written notice from Owners must, reconvey said lot to Owners, and upon such reconveyance Buyers' obligation to pay the purchase price thereof will be cancelled. 10. In the event Buyers do not exercise their option under sub-paragraph (a) of paragraph 3 hereof, or having exercised said option subsequently reconvey one or more of said lots pursuant to the provisions of paragraph 9 hereof, Owners shall pay Buyers for their services in supervising the improvement of said first subdivision as follows: An amount equal to 10 per cent of the cost to Owners of the land and improvements to said first subdivision, divided by the number of lots in said subdivision, for each of said lots not purchased by Buyers or purchased and reconveyed pursuant to said paragraph 9. Said amount shall be paid for each such lot when the lot is sold or conveyed by Owners to any other person. 11. Buyers will proceed with reasonable diligence to perform the acts agreed by them to be done hereunder. It is understood, however, that *161 the construction and sale of houses on lots purchased by Buyers is solely the operation and responsibility of Buyers or Contractor. Under no circumstances shall Owner and Buyers or Contractor be deemed to be joint venturers or partners. Solely for the purpose of verifying the purchase prices payable hereunder, Owners shall have access to appropriate records of Buyers or Contractor during reasonable business hours. Grant deeds were executed and delivered pursuant to the Wiedemann agreement by Wiedemann to Smith and petitioner on the dates and for the parcels of land as follows: (a) October 5, 1953 - approximately 13 acres, being the bulk of Parcel 1; (b) January 6, 1955 - approximately three-tenths acre, the balance of Parcel 1; (c) January 6, 1955 - approximately 7 acres, Parcel 2; and (d) January 23, 1956 - approximately 15 acres, Parcels 3 and 4. The option was exercised and a deed for the 23.19 acres (Parcel 5) was executed and delivered pursuant to the Wiedemann agreement by Wiedemann to Smith and petitioner on April 18, 1957. At all times prior to the execution of the DKB agreement the tract of land covered by the Wiedemann agreement was zoned for agricultural use. Subsequent *162 to the execution of the DKB agreement, but prior to the conveyance by Smith and petitioner of any parcel of land to DK&B, such parcel was rezoned pursuant to the DKB agreement to permit construction of single residences. Rezoning involved filing of petitions with the County of Ventura and the City of San Buenaventura which were carried out and effectuated by Davies, Keusder and Brown pursuant to the DKB agreement. Pursuant to the DKB agreement, Davies, Keusder and Brown supervised the designing, engineering, and installation of all off-site improvements, including but not limited to contracting with others, inspection of standards of compliance by other contracting parties and disbursement of moneys to such other contracting parties. The costs relating to rezoning of the land, engineering fees, and costs of off-site improvements were charged to Smith and petitioner pursuant to paragraph 1 of the DKB agreement and were included in the amount paid by DK&B to Smith and petitioner pursuant to paragraph 5 of the DKB agreement. The 35.04 cares of land covered by the Wiedemann agreement were divided into four parcels and developed as three separate units. Units 1 and 2 were identical *163 to parcels 1 and 2. Unit 3 was comprised of parcels 3 and 4. The 23.19 acres of land covered by the option in the Wiedemann agreement constituted the fifth parcel, all but 7 acres of which were developed as Unit 4. Unit 1 was subdivided into 38 lots. Subdivision improvements for unit 1, consisting of rezoning costs, engineering costs, and off-site improvement costs, amounted to $50,501.18. Unit 2 was subdivided into 27 lots. Subdivision improvements for unit 2 amounted to $37,421.59. Unit 3 was subdivided into approximately 65 lots. Subdivision improvements for unit 3 amounted to $79,713.06. Unit 4 was subdivided into 57 residential lots. Subdivision improvements for unit 4 amounted to $105,455.89. Smith and petitioner signed various subdivision plans, maps, and documents prepared by DK&B. However, because of their lack of knowledge or experience in the business of subdividing raw acreage into residential lots, they relied heavily on the professional ability of DK&B. Title to the land in each unit being developed by DK&B remained in Smith and petitioner until shortly before the off-site improvements were completed and construction of the on-site improvements was to begin. *164 When DK&B secured FHA insurance commitments and construction loans from the bank, Smith and petitioner would then convey title to the land to DK&B or their nominee. Grant deeds were executed and delivered by Smith and petitioner to DK&B or Holiday Homes Company, a partnership consisting of DK&B and Davies, Keusder and Brown, Inc., pursuant to the DKB agreement on the dates and for the parcels of land as follows: (a) November 24, 1954 - 3 lots in Parcel 1 to DK&B to be used for model homes; (b) February 11, 1955 - balance of Parcel 1 to DK&B; (c) December 26, 1955 - Parcel 2 to DK&B; (d) December 8, 1956 - Parcels 3 and 4 to Holiday Homes Company; (e) April 18, 1958 - a portion of Parcel 5 indicated as residential in the map to Holiday Homes Company; and (f) June 16, 1958 - balance of Parcel 5 indicated as residential in the map to Holiday Homes Company. Grant deeds to the 7 acres excluded from the DKB agreement were executed and delivered by Smith and petitioner on the dates, to the persons, and for the parcels of land as follows: (a) January 13, 1958 - the portion of Parcel 5 designated as "suggested church site," to St. John's Methodist Church of Ventura; and (b) March 26, 1959 - *165 the portion of Parcel 5 designated as "proposed commercial," to Milford C. Ludwig. All of the property covered by the Wiedemann agreement, except the three-tenths acre, was held by petitioner for more than 6 months. Paragraph 7 of the DKB agreement provides that the purchase price was to be payable upon the sale of each lot and the house constructed thereon by DK&B. However, paragraph 7 was amended by oral agreement so as to permit settlement on the basis of units rather than individual lots. Upon the sale of substantially all of the completed homes in each of the four units, the profits were computed and a settlement made. On March 31, 1956, DK&B settled with Smith and petitioner for 35 of the 38 lots and houses constructed and sold in Unit 1. The payment due to Smith and petitioner amounted to $116,882.30 which sum included $24,615.30, one-half of the net profit realized on the sale of the 35 lots and houses. On January 27, 1957, DK&B settled with Smith and petitioner for the 27 lots and houses constructed and sold in Unit 2. The payment due to Smith and petitioner amounted to $107,216.09 which sum included $34,415, one-half of the net profit realized on the sale of said *166 27 lots and houses. On January 8, 1958, DK&B settled with Smith and petitioner for the 65 lots and houses constructed and sold in Unit 3. The payment due to Smith and petitioner amounted to $242,802.72 which sum included $72,795.41, one-half of the net profit realized on the sale of said 65 lots and houses. On November 20, 1959, DK&B settled with Smith and petitioner for the 57 lots and houses constructed and sold in Unit 4 and for 2 lots and houses from the Unit 1 inventory. The total amount due to Smith and petitioner, before reduction for earlier partial payments, was $298,974.35 which sum included $89,066.46, one-half of the net profit realized on the sale of said 59 lots and houses. Petitioner realized total gain from the disposition of land covered by the Wiedeman agreement as follows: 1957
$ 3,101.46
1958
16,929.66
1959
45,720.64
From late 1953 to early 1955 a lemon grove was operated for petitioner on substantially all of what became Unit 1. The grove was operated by the Montalvo Lemon Growers Associate assisted by real estate broker Jack Borrell. Petitioner received all of the net profits from the operation pursuant to his agreement with Smith *167 to accept said profits in lieu of interest on the promissory note Smith had given him. Petitioner himself had nothing personally to do with the operation of the lemon grove. In 1955 petitioner spent about 6 months organizing a group of individuals to petition for a savings and loan charter in La Habra, California. The petition was denied. Thereafter, petitioner started a bookkeeping service in Santa Ana, California, under the name of Capital Business Service. The bookkeeping service was managed by him until he was forced to sell out on November 1, 1957, because of failing eyesight. Later he became involved with World Wide Products, Inc., a California corporation, which was supposed to engage in the importing business. World Wide Products, Inc., became inactive in 1959 and petitioner was unemployed until December 1959 when he acquired an interest in World Sales, Inc., an importing firm. Over the years the petitioner has owned and sold three rental properties. These properties consisted of two business buildings in Kansas (inherited from his family) and a duplex in Santa Barbara, California. The Kansas properties were sold in 1956, after having been owned from 12 to nearly 20 years. *168 The duplex was sold in 1955. Ultimate Finding Petitioner initially acquired and at all times held his interest in the Wiedemann agreement and the land covered thereby primarily for sale to customers in the ordinary course of his trade or business. Opinion Should the amounts received by the petitioner during the years 1956, 1957, and 1958 from the sale of houses and lots be taxed as ordinary income, as determined by respondent, or as long-term capital gain, as contended by petitioner? That is the issue confronting us. Its resolution depends on whether the petitioner's interest in the property was held by him "primarily for sale to customers in the ordinary course of his trade or business," so as to be excluded from the definition of a capital asset under section 1221(1), Internal Revenue Code of 1954. [1]
*169 The petitioner maintains that, at the time of the sale to DK&B, the property was held by him for investment and not for sale to customers in the ordinary course of his business; that petitioner's activities with respect to the property were insufficient to constitute a trade or business; and that since there was no intention on the part of petitioner and DK&B to become partners or joint venturers, no sharing of losses, and no joint ownership, supervision or control, he did not become a partner or joint venturer with DK&B. Respondent, on the other hand, urges that petitioner's gain be taxed as ordinary income for two reasons: First, that such gain merely represents the petitioner's distributive share of the ordinary income of a joint venture which petitioner and Smith entered into with DK&B; and, second, that petitioner initially purchased and continued to hold his interest in the property primarily for subdivision and sale to customers in the ordinary course of business, and not as an investment. We find it unnecessary to determine whether Smith and the petitioner were joint venturers with DK&B. Perhaps in a narrow sense some of the essential elements of a joint venture under California *170 law are missing, Joe Balestrieri & Co. v. Commissioner, 177 F. 2d 867 (C.A. 9, 1949), even though for Federal tax purposes State law criteria for determining the existence of a joint venture may not be conclusive. Cf. Commissioner v. Culbertson, 337 U.S. 733 (1949); and United States v. Kintner, 216 F. 2d 418 (C.A. 9, 1954). But regardless of how one might characterize the business relationship of Smith and petitioner to DK&B, the totality of the evidence presented, despite the arguments advanced by petitioner's able counsel, convinces us that the petitioner did in fact hold his interest in the property for sale to customers in the ordinary course of business. We therefore agree with respondent's second contention and prefer to rest our decision on that ground. Essentially the issue is factual. Kelley v. Commissioner, 281 F. 2d 527 (C.A. 9, 1960); Pool v. Commissioner, 251 F. 2d 233 (C.A. 9, 1957), certiorari denied 356 U.S. 938 (1958). The same issue under varying factual situations has been litigated numerous times and the courts have repeatedly emphasized that each case must be decided on its own facts. *171 Certain factors have been recognized as helpful guides in reaching the correct result. Among them are: (1) the reason, purpose, and intent for which the property was acquired and held; (2) the frequency, continuity, size, and substantial nature of the transactions claimed to result in a trade or business; (3) the activities of the seller or those acting for or in concert with him in the improvement and actual disposition of the property; (4) the extent of improvements made to the property sold; and (5) the proximity of sale to purchase. Equally important to a proper consideration of the issue is our recognition that the capital gain provisions, being an exception to the normal tax rates, are to be construed narrowly, Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 52 (1955); that these provisions were adopted to relieve taxpayers from the burden of high graduated rates imposed upon gains which were realized within a given tax year but which resulted from gradual appreciation over a long period of time, Burnet v. Harmel, 287 U.S. 103, 106 (1932); and that the statutory provision here involved is intended to distinguish between those situations where *172 the taxpayer's profit is expected to arise merely from appreciation over a period of time and those in which it arises from the taxpayer's actions and activities with regard to the property. George R. Kemon, 16 T.C. 1026, 1032-33 (1951); Frank v. Commissioner, 321 F. 2d 143, 151 (C.A. 8, 1963); Galena Oaks Corporation v. Scofield, 218 F. 2d 217, 220 (C.A. 5, 1954). Since the answer must be determined from all the facts and circumstances here present, we believe it would serve no useful purpose to embark upon a detailed discussion and analysis of the facts contained in the many cases cited by both parties in their briefs. Suffice it to say that we have examined and considered all of them. As applicable to the facts of this case, we will comment on the pertinent factors previously mentioned. The record establishes particularly through petitioner's own testimony, that the purpose for which he originally purchased on October 5, 1953, his interest in the Wiedemann agreement was the possibility of developing and subdividing the property. He actually discussed this possibility with real estate brokers. It is clear that his general intention at *173 that time was to subdivide the property. Both parties agree that the purpose for which property originally was acquired is not determinative, but the decisive question is the purpose for which it primarily was held when sold. Nelson A. Farry, 13 T.C. 8 (1949). Nevertheless, the original purpose does have an evidentiary bearing on the purpose with which the property was held at the time of sale where the original intention may be deemed to have continued. Although petitioner claims a frustration of his initial purpose and a "clear and unmistakable investment purpose" from January to July 1954, we think the facts fail to support his claim. He and Smith intended a rapid turnover of the land and a quick profit. They became the subdividers of the Weidemann land under the express terms of their agreement with DK&B. They accomplished exactly what they originally set out to do - subdivide and sell lots. And, besides that, they got 50 percent of the net profits from the sale of all houses sold by DK&B on such lots. In January 1954 petitioner and Smith owned only 13 of the original 35.04 acres covered by the Wiedemann agreement. Rather than dispose of these holdings, they entered *174 into a transaction whereby they not only became obligated to subdivide and improve the 13 acres but also to acquire the remaining 21.04 acres of the original tract. In addition, they later exercised an option on another 23.19 acres. All of this seems inconsistent with petitioner's asserted effort to "call it a bad deal and get out." In our opinion there was no period of time during which his alleged "investment purpose" manifested itself. His original intention was never abandoned. The evidence with respect to the frequency, continuity, extent, and substantiality of the transactions strongly supports the conclusion that the petitioner was in the trade or business of selling real estate. There was constant subdividing, improving, and developing activity taking place from 1954 to 1959. Unit 1 was subdivided into 38 lots; Unit 2 into 27 lots; Unit 3 into 65 lots; Unit 4 into 57 lots. These subdivision improvements, which were charged to petitioner and Smith under the terms of the DKB agreement, totaled approximately $293,092.72. Petitioner and Smith received substantial payments from DK&B, viz., $116,882.30 in 1956; $107,216.09 in 1957; $242,802.72 in 1958; and $298,974.35 in 1959. *175 Of these amounts, a total of $220,832.17 represented their share of the net profits from the sale of 186 houses and lots. Moreover, the petitioner's main source of income during such years was derived from these transactions. His income tax returns show that the Capital Business Service (bookkeeping) had a net loss of $4,256.55 in 1956 and $753.82 in 1957; and a net profit of only $1,500 in 1958. By contrast the petitioner reported other income of $15,899.78 in 1956, $18,037.49 in 1957, and $14,237.58 in 1958. Almost all of the other income consisted of the profits derived from the transactions here involved. It is plain that subdividing property into building lots, making substantial improvements thereon to enhance their value, offering them for sale at a price greatly in excess of the cost of land and improvements, and making frequent and continuous sales are generally activities engaged in by persons in the trade or business of selling real estate, and not by persons who are interested only in the casual and passive liquidation of an asset. See Kelley v. Commissioner, 281 F. 2d 527 (C.A. 9, 1960), affirming a Memorandum Opinion of this Court. To be sure, an important *176 factor in this proceeding is whether the actions of DK&B can be imputed to petitioner and Smith. It is true that neither he nor Smith had the experience or skill required to proceed on their own in the subdivision business. And, while the DK&B partnership was experienced and skilled in the construction business, it lacked the finances with which to acquire the land, subdivide it and install the off-site improvements. Thus, by the terms of the DKB agreement, each group supplied the deficiencies of the other. Petitioner and Smith contributed the funds for fulfilling the terms of the Wiedemann agreement and purchasing the land. In addition, they furnished the financial backing to carry the project through the subdivision and off-site improvement stages to a point where bank construction loans and FHA insurance commitments could be obtained with which to build the houses. DK&B, on the other hand, contributed their professional skills. They provided the knowledge necessary to get the project approved by the various governmental bodies, to supervise the installation of streets, curbs, sewers, gutters, and necessary utilities, and to construct houses on the subdivided lots, all in such a *177 way that the completed project could be sold at a profit. Indubitably the parties to the agreement operated together in what amounted to a common undertaking to develop and sell the property. Cf. Raymond Bauschard, 31 T.C. 910 (1959), affd. 279 F. 2d 115 (C.A. 6, 1960). Whatever was done here by DK&B was done at the instance and for the benefit of the petitioner and Smith. Cf. Walter H. Kaltreider, 28 T.C. 121 (1957), affd. 255 F. 2d 833 (C.A. 3, 1958). The acts of each were directly attributable to the other. Viewed in this light there is no merit to petitioner's contention that his participation in the subdivision, house construction, and sale activities was merely passive. In a transaction of this type the tax consequences must be determined by a realistic and common sense interpretation of the actions of the parties. As we see it, both groups under the DKB agreement were making a contribution essential to the ultimate realization of a profitable enterprise. Still another significant factor in this case is the length of time the property was held and the interval which elapsed between its acquisition and sale. Petitioner acquired *178 his interest in the Wiedemann agreement in October 1953 and by July 1954 he and Smith had entered into the agreement with DK&B for its subdivision and development. Work in connection with the project continued steadily from that time until November 1959. Hence, this certainly is not the case of a casual liquidation of a capital investment acquired either by purchase or inheritance and held for a prolonged period of time. Instead, all the acts relative to the purchase of the land, its development, and the ultimate sales of the houses and lots were accomplished with considerable speed. Raymond Bauschard, supra.Such cases as Yunker v. Commissioner, 256 F. 2d 130 (C.A. 6, 1958); Estate of William D. Mundy, 36 T.C. 703 (1961); and W. T. Thrift, is T.C. 366 (1950), are distinguishable. Accordingly, on the basis of the record before us, we hold that the respondent did not err in determining that the gain realized from the sale of the real property in question was taxable as ordinary income and not as capital gain. Decision will be entered for the respondent. Footnotes
1. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;↩